HOOD, Judge.
The plaintiff in this action, Louisiana State Board of Optometry Examiners seeks to enjoin the defendants, Pearle Optical of Alexandria, Inc., and Dr. Joseph W. Kelly, from performing certain acts which are alleged to be in violation of the Louisiana Optometry Regulatory Act (LSA-R.S. 37:1041 et seq.). After trial, judgment was rendered by the trial court granting plaintiff a part of the relief which it sought as to the defendant, Pearle Optical, but dismissing the suit as to Dr. Kelly. Plaintiff and one of the defendants, Pearle Optical of Alexandria, Inc., have appealed.
Plaintiff alleges in its petition that Pearle Optical has violated the provisions of LSA-R.S. 37:1041 et seq., in the following particulars:
“1. By use of the license of Dr. Joseph W. Kelly the corporation is doing indirectly what the law forbids it to do directly, namely practice optometry without first having obtained a certificate to practice as a licensed optometrist.
2. Advertising or holding itself out to be qualified to furnish optometric services without first having a valid certificate to practice as an optometrist.
3. Purchased or procured by barter the certificate and name of Dr. Joseph W. Kelly with intent to use it as evidence of its qualification to practice optometry; and furnish optomet-ric services.
*166 4. Advertising as free or for a price one or more of the following: The examination or treatment of the eyes; the furnishing of optometrical services; the furnishing of a lense, lenses, glasses or the frames or fittings thereof; specifically the corporation is employing the use of the words ‘credit terms’ in newspaper, radio and billboard advertising in the Alexandria areas.”
Plaintiff also alleges that Dr. Kelly has violated the same statutory provisions by the following acts:
“1. By having a professional connection with or lending his name to an illegal practitioner, namely, Pearle Optical of Alexandria, Inc.
2. By advertising price, credit terms, or agreement with reference to the practice of optometry.
3. Employing or using steerers to obtain business, namely, Pearle Optical of Alexandria, Inc.”
The defendant, Pearle Optical of Alexandria, Inc., is a subsidiary or an alter ego of Pearle Optical, Inc., a foreign corporation. Early in 1964, Pearle Optical, Inc., rented or leased from the owner the major portion of a commercial building which is located on Third and Johnston Streets in Alexandria, Louisiana. It then proceeded to remodel the leased premises so that one portion of the building could be used to house a retail store for the sale of glasses, lenses, frames and related merchandise. The remaining portion of the leased premises was remodeled to provide office space for an optometrist. The arrangement of the office and store, after the remodeling, was such that the optometrist’s office faces on Johnston Street, with the front entrance opening on that street, while the front entrance of the optical store is located at the corner of the building facing the intersection of Johnston and Third Streets. There is a common corridor located at the rear of the optical store which would permit a person to go from the optical store into the optometrist’s office, or vice-versa, without going outside the building. This common corridor also leads to restrooms which service both the store and the optometrist’s office.
As soon as the remodeling of the building had been completed, Pearle Optical occupied that portion which had been designed for use as a store, and on June 12, 1964, it formally opened for business in that location for the retail sale of glasses, lenses, frames and related merchandise, and for the filling of prescriptions for lenses and spectacles. Shortly before that time, however, a new corporation was formed which was called “Pearle Optical of Alexandria, Inc., and the retail business of the Alexandria store was operated by that corporation. That new corporation, of course, is one of the defendants in this suit, and, as we have already pointed out, it clearly is an alter ego of Pearle Optical, Inc.
On the same day the above mentioned retail store opened for business, June 12, 1964, Pearle Optical, Inc., entered into an agreement with Dr. Joseph W. Kelly, a licensed optometrist of Shreveport, Louisiana, under the terms of which Pearle Optical sub-leased to Dr. Kelly that portion of the premises which had been remodeled and arranged for use as an optometrist’s office. The lease was for a period of one month, and it provided that in the event of a holdover after the first month it would he construed as a month-to-month lease agreement. Under the terms of the agreement, Dr. Kelly was to pay to Pearle Optical, Inc., the sum of $75.00 per month for the use of this office space, and Pearle Optical was to take care of the expenses of all utilities, janitorial services, maintenance and air conditioning.
Dr. Kelly was licensed to practice optometry in the State of Louisiana in 1944, and he practiced in Shreveport from that date until the above mentioned lease con *167 tract was completed. On June 12, 1964, which was the date of that lease, he occupied and foi'mally opened an office for the practice of optometry in Alexandria, in the office space which he had leased from Pearle Optical. As we have already noted, the retail store of Pearle Optical was opened for business on the same day in that part of the same building which had been remodeled for use as a store.
On June 12, 1964, and on several occasions thereafter, Pearle Optical authorized and paid for a series of advertisements in the Alexandria “Daily Town Talk,” a local newspaper, announcing that Pearle Optical had come to Alexandria, that it had offices in principal cities, and that it was one of America’s famous optical names. Each of these ads covered three-quarters of a page of the newspaper, and all of the ads were identical. The advertisement carried a picture of Pearle Optical’s new store or location in Alexandria, and this picture showed large signs appearing on the outside of the building above the display windows advertising “first quality glasses,” “contact lenses,” “convenient credit terms,” “exacting workmanship,” “over 100 famous frame styles,” and “Verilite contact lenses.” The ad also contained the following statement:
“So many people wear Pearle Optical Verilite contact lenses, why not you? Our personnel will be happy to discuss contact lenses with you.”
The evidence shows that defendant, Pearle Optical, has in its possession a lense-meter, which is a device used to neutralize a lens and to determine the type of lens or the prescription of the particular lens which is being tested. The evidence shows that on at least two occasions after Pearle Optical opened its retail store in Alexandria it used this lensemeter to duplicate prescription lenses in glasses for customers, and after doing so, Pearle Optical sold to each of said customers glasses purporting to contain lenses of the same prescription as the customer’s regular prescription glasses, all without a written prescription from a licensed optometrist or physician.
With reference to the demands made against Pearle Optical, the trial judge rendered judgment against that defendant enjoining it “from the further practice of optometry in violation of LSA-R.S. 37:1041 et seq., and particularly from advertising the sale of glasses upon credit terms; from advertising the sale of glasses; from advertising a discussion of contact lenses with patrons and from duplicating, selling and replacing lenses in spectacles or eyeglasses without a prescription of a licensed optometrist or physician.”
We will consider first that portion of the judgment appealed from which enjoins Pearle Optical “from advertising the sale of glasses on credit terms.” Plaintiff contends, and the trial judge held, that the advertising of lenses or glasses upon “convenient credit terms” constitutes advertising “for a price,” which is prohibited by LSA-R.S. 37:1063(9). Pearle Optical concedes that the law prohibits it from advertising the furnishing of lenses or glasses “as free or for .a price,” but it contends that the use of the words, “convenient credit terms,” in connection with the advertisement of lenses and glasses does not constitute the advertising of those items for a price.
LSA-R.S. 37:1063(9), which is contained in Chapter 12, of Title 37, of the Revised Statutes, provides:
“No person shall: (9) Advertise as free or for a price, any of the following: The examination, or treatment of the eyes; the furnishing of optometrical services; or the furnishing of a lense, lenses, glasses, or the frames or fittings thereof.”
LSA-R.S. 37:1065, which appears in the same chapter, provides:
“Exemptions — The provisions of this Chapter shall not apply to physicians or surgeons licensed to practice in this *168 state nor to retail dealers selling glasses as merchandise in their established places of business. But it is unlawful for any person, except those licensed to practice under the provisions of this Chapter, to have in their possession any trial lenses, trial frames, graduated test cards, or other appliances or instruments for the purpose of rendering assistance to their patrons in the selection of lenses, spectacles, or eyeglasses, or use any device, appliances, or instruments in testing the eyes for the sale of spectacles or eyeglass lenses other than the lenses actually sold, or sell or replace broken lenses in spectacles or eyeglasses except upon prescription of a licensed optometrist.

No retail dealer shall directly or indirectly, advertise through any medium the sale of glasses, or peddle, solicit, sell, or offer for sale glasses from door to door, or house to house, or away from his permanent established place of business.”

In State v. Rones, 223 La. 839, 67 So.2d 99, our Supreme Court stated that LSA-R.S. 37:1063(9) does not prohibit all advertising of lenses and glasses, but that it does make it unlawful for any person to advertise the furnishing of optometrical services, lens, lenses, glasses, or the frames or fittings thereof, as free or for a price. The court held that statutes regulating the advertising by retail dealers of eyeglasses “are a reasonable exercise of the police power because they prevent ‘bait advertising’ which attracts the unwary to purchase inferior glasses; eliminate the temptation to, and the pressure upon, customers that result from the assurance that no more than a named price will be charged; protect an uncautious and unwary public from being misled and deceived; prevent the increase in sales and the incidental harm that come from unfitted eyeglasses; eliminate to some extent poor quality and poor workmanship which naturally result from the desire to sell spectacles in quantity at a low advertised price for the purpose of underselling competitors.”
In the same case, and with reference to the above cited provision of the Revised Statutes, the court said:
“LSA-R.S. 37:1063(9), under which defendant was charged, makes it unlawful for any person to advertise as free or for a price the furnishing of optometrical services or of a lens, lenses, glasses, or the frames or fittings thereof, but in no way prohibits all advertising. For instance, this particular subsection of the statute does not prohibit anyone, a retail dealer or otherwise, from advertising that opticians are available to fit glasses to the face, or that a lens, lenses, glasses, or the frames or fittings thereof are available for sale. Any advertisement which does not offer such services or merchandise for a price or as free would not come within its prohibition.” (67 So.2d 99, 104.)
The advertisement which was involved in the Rones case gave the specific prices; for which glasses were to be sold, while the advertisement involved in the instant suit stated that lenses and glasses were available on “convenient credit terms.” The question presented is whether such an advertisement constitutes the advertising of lenses and glasses “for a price.”
In Akin et al. v. Louisiana State Board of Optometry Examiners, 245 La. 481, 158 So.2d 833, a retail dealer of lenses and glasses advertised that it guaranteed the prescription glasses which it sold against breakage for a year, and that it would repair or replace glasses which might be broken within that time. The Supreme Court, in holding that such an advertisement constituted a violation of LSA-R.S. 37:1061(14), said:
“Obviously, publication by an optometrist that he will replace any broken glasses that he has prescribed *169 without charge if they are broken within the space of a year is, in essence, a conditional promise of a rebate or an advance credit which relates to price and terms of his services. Indeed, it is an 'agreement’ by him pertaining to the practice of optometry to include a thing of value over and above the services he performs as an extra inducement to obtain patronage. This is precisely what the statute bans.” (emphasis added)
In Michon v. Louisiana State Board of Optometry Examiners, La.App. 2 Cir., 121 So.2d 565, it was held that an advertisement of glasses containing the statements, ‘‘low prices,” “we will not be undersold,” “finest glasses at low prices,” “glasses are not expensive,” and “popular prices,” constituted a violation of LSA-R.S. 37:1061 (14). The court said:
“The crux of appellant’s argument is that he has not violated paragraph (14) of Section 1061 of the Statute for the reason that the statements contained in the advertisements were worded in general rather than specific terms. It is our thinking that if it is the purpose of the statute to properly regulate the conduct of the profession in order to maintain high standards and obtain better quality of professional work for betterment of public health, the question of whether an advertisement proposes a low price or a popular price in lieu of a specific price, is of no significance.” (Emphasis added)
Although the provisions of LSA-R.S. 37:1061(14) are somewhat broader than those contained in LSA-R.S. 37:1063(9), we think the cases herein cited indicate that advertising glasses on convenient credit terms “relates to price,” and thus it is within the prohibition of advertising glasses "for a price.” The advertising of glasses on convenient credit terms necessarily implies that the glasses are being furnished for a price. We believe that such an advertisement not only relates to price, but that it also constitutes “bait advertising,” in that such an offer clearly is made and published to induce the public to patronize that establishment solely on the basis that the payment of the price of the glasses will be made easier because of the credit terms.
We conclude, therefore, that the advertising by Pearle Optical that lenses or glasses will be furnished on “convenient credit terms” constitutes the advertising of the furnishing of lenses or glasses “for a price,” in violation of the provisions of LSA-R.S. 37:1063(9). There is no error, therefore, in that portion of the judgment of the trial court which enjoins Pearle Optical “from advertising the sale of glasses upon credit terms.”
The judgment appealed from also enjoins Pearle Optical “from advertising the sale of glasses,” the trial judge concluding that LSA-R.S'. 37:1065 prohibits retail dealers from advertising the sale of glasses in any manner whatsoever. In contending that the trial court erred, Pearle Optical argues: (1) That the last paragraph of LSA-R.S. 37:1065 does not prohibit retail dealers from advertising the sale of glasses completely, but that it simply makes them subject to the same restrictions as are imposed on all other persons by LSA-R.S. 37:1063(9); and (2) that in the event Section 1065 is given a broader interpretation than this, then the last paragraph of that section is unconstitutional in that it deprives Pearle Optical of its liberty and property without due process of law, as guaranteed by Article I, Section 2, of the Louisiana Constitution, and the Fourteenth Amendment of the Constitution of the United States, or, in the alternative, that it constitutes an unreasonable regulation of the retail sale and advertisement of eyeglasses.
We agree with plaintiff that the language used in the last paragraph of LSA-R.S. 37:1065, considered alone, appears to prohibit retail dealers from advertising the sale *170 of glasses in any manner. We note, however, that Section 1065 is entitled “Exemptions,” and its purpose obviously is to exempt physicians, surgeons and retail dealers of glasses from the provisions of the Optometry Act, except as to certain provisions of the Act which the Legislature felt should apply to retail dealers.
LSA-R.S. 37:1065 has as its source Act 193 of 1918, as amended by Act 181 of 1920, and as further amended by Act 172 of 1942. Section 11 of the 1918 act related solely to physicians and surgeons, exempting them completely from the provisions of the act, and that section was not amended prior to 1950. Section 19 related solely to retail dealers, and that section was amended in 1920 and again in 1942. When the Louisiana Revised Statutes were compiled and enacted in 1950, the provisions of these two sections of the original statute were combined into one section of the Revised Statutes, R.S. 37:1065. Section 19 of the 1918 act, as amended in 1942, begins with the words, “This Act shall not apply to Retail Dealers, except as hereinafter provided * * * ,” and then it proceeds to list the exceptions. The same section, as worded in the 1942 amendment, closes with the following paragraph:
“That no retail dealer shall be permitted, to advertise through any medium whatsoever the sale of glasses, or to peddle, solicit, sell, or offer for sale, glasses from door to door or house to house personally or through an agent, or away from his permanent established place of business.”
The wording of the above quoted portion of the act was changed to some extent when incorporated into the Revised Statutes in 1950.
Since the obvious purpose of Section 1065 was to exempt certain persons from the provisions of the Optometry Act, except in the particulars which were therein specified, it is reasonable to assume that the last paragraph of that section was intended only to exclude from that exemption, or to not exempt the classes of persons therein listed from, those provisions of the act which prohibit, at least partially, the advertising of glasses.
If Section 1065 is given the broad interpretation which plaintiff contends it should be given, then it seems to us that it would apply to licensed optometrists who sell glasses in connection with their professional practice, as well as to non-licensed retail dealers. We find it difficult to believe that the Legislature, in enacting the last paragraph of LSA-R.S. 37:1065, intended to prohibit retail dealers, including licensed optometrists who sell glasses, from advertising tlie sale of glasses completely, when no one else is subject to such a broad prohibition. We agree that a person who is not a retail dealer of glasses is not likely to advertise them for sale, but if we adopt plaintiff’s interpretation of the act, then we must assume that the Legislature intended to completely bar retail dealers from advertising the sale of glasses, while permitting brokers or anyone other than a retail dealer to do so. We do not feel that the Legislature had any such intent.
Also, if the Legislature had intended for the last paragraph of Section 1065 to have such a broad application, then it seems to us that that particular provision would have been included in Section 1063, which contains other general prohibitions, rather than in Section 1065, which merely exempts certain classes of persons from some of the provisions of the Optometry Act. In that connection we note that practically all of the present provisions of LSA-R.S. 37:-1063, as well as the last paragraph of Section 1065, were added to the Optometry Act initially by the 1942 amendment (Act 173 of 1942). We think this shows that the Legislature intended for the last paragraph of Section 1065 to be merely a qualification of or an exception to the exemptions which are provided in the first part of that section, rather than a new and broad prohibition relating to the advertising or sale of glasses.
*171 We conclude, therefore, that the last ■paragraph of LSA-R.S. 37:1065 was not intended to prohibit retail dealers from advertising the sale of glasses completely, but that it merely makes retail dealers subject to the same restrictions as are imposed on any other person by LSA-R.S. 37:1063(9). We feel, therefore, that the trial judge erred in enjoining Pearle Optical “from advertising the sale of glasses,” and that the judgment should be amended to delete that particular portion of the decree.
In view of the conclusions which we have reached as to the application of LSA-R.S. 37:1065, it is not necessary for us to consider the alternative pleas and arguments presented by defendants that at least portions of that section are unconstitutional.
The judgment appealed from also prohibits Pearle Optical “from advertising a discussion of contact lenses with patrons.” With reference to that portion of the judgment, the trial judge said:
“Another violation of the statute occurred, in this writer’s opinion, when Pearle Optical advertised contact lenses. The stating in the newspaper advertisement that its personnel would be happy to discuss contact lenses with the patron definitely implies that the personnel at Pearle Optical wished to, discuss with the patron the advisability of the wearing of contact lenses and the advising of the patron in all respects regarding the wearing of contact lenses. This advertisement would seem to indicate to the patron that he can obtain from the personnel of Pearle Optical information as to whether or not he should wear contact lenses, the kind he should wear, the use of contact lenses and whether or not contact lenses can be fitted to his eyes. This is the clear implication of this advertisement and it is repugnant to the statute.”
Pearle Optical argues that the advertisement that its personnel would be happy to discuss contact lenses with patrons in no way suggests that it would examine a patron’s eyes to determine visual error and attempt to fit the patron’s eyes with contact lenses deemed suitable by it. The clear implication of this advertisement, it is argued, is an invitation into the place of business and nothing more.
In LSA-R.S. 37:1041, the practice of optometry is defined as follows:
“(3) ‘Optometry’ means that practice in which a person employs or applies any means other than the use of drugs, medicines, or surgery for the measurement of the powers and testing the range of vision of the human eye, and determines its accommodative and refractive state, general scope of function and the adaptation of frames and lenses to overcome errors of refraction, and restores as near as possible with these mechanical appliances normal human vision.”
In the Rones case, the defendant optician advertised “[hjighly experienced opticians to’ carefully fit your glasses.” In holding that this was an advertisement for the furnishing of optometrical services, in violation of LSA-R.S. 37:1063(9), the Supreme Court said:
“The practice of optometry as defined by the statute includes the fitting (adaptation) of frames and lenses to overcome the errors of refraction, etc., and the advertisement states that opticians are available ‘to carefully fit your glasses’. The word ‘fit’, used in this advertisement without limitation, would convey to the reading public that opticians are available to fit glasses for all purposes, necessarily including the fitting of frames and lenses to overcome errors of refraction. ‘Fitting glasses’ means fitting them to the eyes as well as to the face. Although the defendant, an optician, may be actually engaged only in rendering optical services, such as fitting glasses to the face, adjusting the nosepieces, etc., for com *172 fort and improving the appearance, the advertisement in the instant case does not so specify. Its broad, unqualified language is therefore an advertisement for the furnishing of optometrical services, which is denounced and prohibited by the statute.”

I-

It is our opinion that the advertisement by Pearle Optical that “our personnel will be happy to discuss contact lenses with you” implies that Pearle Optical is qualified to discuss the advisibility of wearing contact lenses with its patrons. A statement to that effect suggests to any reasonable mind that Pearle Optical is in a position to advise the patron as to his needs insofar as contact lenses are concerned, including the advisability as to whether he should or should not wear them.
We conclude that the advertisement that the personnel of Pearle Optical will “discuss contact lenses” with patrons is an advertisement for the furnishing of optometrical services, as prohibited by LSA-R.S. 37 :- 1063(9), and further that it constitutes advertising or holding Pearle Optical out as being an optometrist without having a valid certificate issued by the Board, as prohibited by Section 1063(3). We find no error in that portion of the judgment appealed from which prohibits Pearle Optical from advertising a discussion of contact lenses with patrons.
The judgment appealed from also enjoins Pearle Optical “from duplicating, selling and replacing lenses in spectacles or eyeglasses without a prescription of a licensed optometrist or physician.” As we have already pointed out, Pearle Optical has in its possession a lensemeter which it has used, and which it concedes it does use, for the purpose of duplicating lenses and selling the lenses so duplicated without a prescription from an optometrist or a physician. LRS-R.S. 37:1065 makes it unlawful for any person to “sell or replace broken lenses in spectacles or eyeglasses except upon prescription of a licensed optometrist.”
Pearle Optical contends that the duplica-' tion of lenses is the function of an optician and that “lenses once ground are a prescription within themselves.” It is argued that when lenses have once been prescribed for a person, then the optician may legally duplicate that lens without a further prescription, because the replacement lens so duplicated would be “upon prescription of a licensed optometrist.”
We cannot agree with this argument. Section 1065, in clear and unambiguous language, makes it unlawful for a person to sell lenses or to replace broken lenses in spectacles or eyeglasses without a prescription from a licensed optometrist. The only logical interpretation which we think can be placed on this provision is that it is unlawful for anyone, including a retail dealer of lenses and glasses, to sell a prescription lens, initially or as a replacement or duplicate of a previously prescribed lens, without a prescription from a licensed optometrist or physician. In our opinion, the Legislature intended to prohibit a retail dealer of lenses, who is not a licensed optometrist or physician, from selling replacement or duplicate lenses which have refractive values, without a specific prescription from a licensed optometrist or physician.
We think such a regulation is reasonable. An optician who is asked to duplicate another lens, for instance, ordinarily would have no way of knowing whether that lens had actually been prescribed by a licensed optometrist or a physician. Even if it had been properly prescribed originally, he would not know whether the prescription was for this particular patron. One of the experts who testified at the trial stated that the condition of the patron’s eyes frequently changes with time after a prescription is given, and that in some instances it may be harmful to him to obtain a duplicate of his old lenses without the advice of a qualified person. While we see some fallacy in this last observation, there is no question but that the requirement of a prescription from a licensed expert before a- *173 lens can be sold will avoid harm on at least some occasions, and we recognize that that is a factor which might validly have been considered by the Legislature in enacting the Optometry Act. Also, Dr. Chester H. Pheiffer, Professor of Optometry at the University of Houston, testified that a lensemeter alone is not sufficient to enable an optician to duplicate lenses, although he concedes that a competent optician with the necessary equipment can duplicate them. The record does not show whether retail dealers customarily have all of the equipment necessary for accurately duplicating lenses, and there apparently are no board or license requirements which apply to retail dealers and which would provide some assurance to the public that the optician who attempts to duplicate a lens for the human eye is qualified to do so.
If the statute should be construed to mean that retail dealers may duplicate lenses without prescriptions, as contended by Pearle Optical, then it seems to us that when that is done no records will be available to determine whether the optician actually had a prescription lens to test before selling the alleged duplicate, and the result would be that the statutory prohibition against the sale of lenses without a prescription would be a useless and ineffective piece of legislation.
Defendants rely to some extent on the following language which was used by the Supreme Court in Akin v. Louisiana State Board of Optometry Examiners, supra, to-wit:
“It is, of course, true that replacement of glasses for which a prescription has already been filled is purely an optical function.” (158 So.2d 833, 836)
The issue presented in that case was whether an advertisement by a licensed optometrist constituted a violation of the provisions of LSA-R.S. 37:1061(14), relating to the advertising of any price, credit, terms, or agreement with reference to the practice of optometry. The issue presented in the instant suit is whether a retail dealer has sold lenses without the prescription of a licensed optometrist or physician, in violation of LSA-R.S. 37:1065. The issues presented, therefore, are entirely different. As we have already pointed out, however, the court found in the Akin case that Section 1061(14) had been violated, so the above quoted observation constituted only dictum. But, even so, we find nothing in that opinion which holds that an optician or retail dealer of glasses may duplicate or replace lenses without a prescription. If the optician fills a prescription for lenses, and either keeps that prescription or has it presented to him again, we think he clearly can refill the same prescription or replace the lenses on that prescription, just as a pharmacist may do with prescriptions issued by a physician for drugs.
In our opinion, the provision of LSA-R.S. 37:1065, which makes it unlawful for any person to sell lenses, “except upon prescription of a regular licensed optometrist,” prohibits any person from duplicating or replacing lenses which have refractive values without a prescription from a licensed optometrist or physician. In that connection we hold that lenses, once ground, are not a prescription within themselves. It is our conclusion that that portion of the judgment of the trial court which prohibits Pearle Optical “from duplicating, selling and replacing lenses in spectacles or eyeglasses without a prescription of a licensed optometrist or physician,” is correct and should be affirmed.
We turn now to the question of whether the trial court erred in rejecting plaintiff’s demands for injunctive relief against Dr. Kelly.
Plaintiff contends that the activities of Dr. Kelly so closely parallel those of Pearle that it is impossible to separate the two and to identify which acts are Kelly’s and which acts are Pearle’s. It is argued that the relationship of Pearle and Kelly is such that it constitutes a subterfuge, permitting *174 Pearle to do indirectly what the statutes and the appellate courts of this state have said a corporation may not do, that is, to practice optometry.
Dr. Kelly testified that he has no professional connection with Pearle Optical at all, that he merely leases office space from that defendant, that he receives no salary, commissions or any other remuneration whatsoever from Pearle Optical, that he has not been guaranteed or assured a minimum income, and that there is no agreement that patrons are to be referred to him by Pearle Optical or that he is to refer prospective patrons to that company.
We have already pointed out that Dr. Kelly’s office is in the same building as the one occupied by Pearle Optical, and that his office has a separate entrance from that used by Pearle Optical. Although there is a common corridor which serves both the office and the store, the evidence does not show that this corridor has ever been used by patrons of either the optometrist or the store.
The evidence shows that the office of another licensed optometrist, Dr. Leighton Hayes, also is located immediately adjacent to Pearle Optical’s store. That office faces on Third Street, and the front entrance of it is about fifteen feet from the front door of Pearle Optical’s store. The front entrance of Dr. Kelly’s office is about forty feet from the entrance to the store, the store being located between these two offices. There, of course, is no common corridor or means of access from Dr. Hayes’ office to the store, without going outside the building. Dr. Hayes apparently did not lease his office from Pearle, and his office was located there before Pearle Optical occupied its present quarters.
The fact that the optical store and Dr. Kelly’s office were connected by a common corridor does not establish that Dr. Kelly has a professional connection with or is lending his name to Pearle Optical. To hold otherwise might compel such an inference where an optometrist and a retail dealer occupy separate quarters in a multiple storied building, with all of the facilities being served by a common elevator or stairway. Neither do we feel that Dr. Kelly’s leasing of office space from Pearle Optical establishes that he has a professional connection with Pearle or that he is lending his name to that company.
Three witnesses, Reynolds, Sandefur and Luneau, testified that shortly after Pearle Optical opened its store, they entered the establishment and were referred by employees in the store to Dr. Kelly for eye examinations. A fourth witness, Fuqua, testified that while he was in the store he heard a clerk refer another customer to Dr. Kelly, but he could not identify the customer and was unable to say whether it was one of the above named witnesses. All four of these witnesses visited Pearle Optical at the request of local optometrists for the purpose of determining whether either or both of the defendants were violating the Optometry Act. Reynolds and Sandefur were optometry students, and the former was paid $200.00 to make this visit and to gather information for that purpose. Luneau and Fuqua were regular employees of a local optometrist, and they made the visit at the request of their employer for the same purpose.
Reynolds testified that when he requested an eye examination at the store he was informed by an employee that Pearle Optical did not conduct eye examinations. He then asked -where he might receive one, and the employee responded that “there was a doctor’s office right around the corner,” and the employee thereupon led him out the front door of the store and pointed out to him the entrance to Dr. Kelly’s office. After having his eyes examined, Reynolds asked Dr. Kelly about the quality of work of Pearle Optical and whether he would be able to get his prescription filled there, whereupon Dr. Kelly replied that “he rather imagined that the work was pretty good quality,” and he suggested that after getting the prescription filled that he return'the *175 glasses to Dr. Kelly so he could check them to see if they were all right.
Sandefur testified that he entered the store and asked for sunglasses ground to the prescription of his existing lenses. An employee then suggested to him that he have his eyes examined, and when he inquired where he could have that done, she stated “Dr. Kelly, right back here, is good,” and she motioned toward the front door of the store and in the direction where Dr. Kelly’s office was located. After the examination, and upon his inquiry as to where he might have the prescription filled, Dr. Kelly stated, “Pearle Optical could fill it, or any other place such as this.”
Luneau testified that upon inquiring at Pearle Optical whether they examined eyes, an employee replied that they didn’t, but “there was a doctor in the back.” He thereupon went outside the building and went to Dr. Kelly’s office for an examination, after which the witness testified that Dr. Kelly said “to take it up front and they would fill the prescription.”
Plaintiff contends that the testimony of these witnesses shows that there was a professional connection or relationship between Pearle Optical and Dr. Kelly, that Dr. Kelly was lending his name to Pearle Optical, an illegal practitioner, and that Dr. Kelly was using employees of Pearle Optical as “steerers” to obtain business. •
The fact that employees of Pearle Optical referred patrons to Dr. Kelly on each of these occasions, even though Dr. Hayes’ office was as close or closer to the retail store, creates some suspicion that through some prior arrangement employees of Pearle Optical were steering patrons to Dr. Kelly. The evidence indicates, however, that this occurred on only three, or possibly four, occasions, and we agree with the trial judge that this is not sufficient to justify a conclusion that there existed any kind of an agreement, arrangement or understanding that patrons were to be steered or referred to Dr. Kelly by Pearle Optical, or vice-versa.
The evidence further shows that on May 14, 1964, Pearle Optical caused to be placed in an optometric weekly magazine the following advertisement:
“Wanted: Louisiana licensed optometrist. Wonderful opportunity for ambitious, competent man to take charge of large, well established practice. Excellent remuneration. Replies confidential. Address D-338 Optomet-ric Weekly.”
Dr. Kelly did not respond to this ad at all, and the evidence does not show that he was even aware of the fact that such an ad was inserted. Three other optometrists did reply to the ad, however, and they received replies on the stationery of Pearle Optical, Atlanta, Georgia, purporting to be signed by Dr. C. R. McClintick, Executive Vice-President of that company. The letters which these optometrists received from Dr. McClintick were received in evidence. In these letters, Dr. McClintick indicates that in some places where Pearle Optical operates a retail store there is a professional or business connection between the optometrist and the retail dealer. We think the type of relationship which was described in at least one of these letters would be in violation of the Optometry Act. In two of the letters it was stated that Dr. Kelly was operating an office in Alexandria, and there is an implication that the office was being operated under that type of an arrangement. Dr. McClintick was not called as a witness, however, and Dr. Kelly specifically denies that there was any type of professional connection between him and Pearle Optical.
We cannot consider the letters written by Dr. McClintick as evidence tending to show that there was a business or professional connection between Pearle Optical and Dr. Kelly. To do so would deprive *176 Dr. Kelly of his right to he confronted with the witness and to cross-examine him. Even if the contents of the letters should he considered as admissible evidence, however, they are not sufficient to establish that there existed a professional connection between Dr. Kelly and Pearle, especially in the face of Dr. Kelly’s testimony that no such relationship existed.
Although plaintiff alleges that Dr. Kelly has violated the Optometry Act by advertising price, credit terms, or agreement with reference to the practice of optometry, there is no evidence in the record tending to support that allegation.
We agree with the observation made by the trial judge in his written reasons for judgment that the evidence creates a “suspicion that Dr. Kelly may be having a professional connection with an illegal practitioner.” As further noted by the trial judge, however, judgments cannot be based on suspicions, and the evidence in this case fails to establish that a professional connection of any kind existed between the defendants. We conclude that plaintiff has failed to establish by a preponderance of the evidence that Dr. Kelly has violated provisions of the Optometry Act, as alleged in the petition, and that the trial judge correctly dismissed the suit as to Dr. Kelly.
For the reasons herein assigned, the judgment appealed from is amended by deleting from that portion of the decree which was rendered against Pearle Optical of Alexandria, Inc., the words, “from advertising the sale of glasses.” In all other respects, and as thus amended, the judgment appealed from is affirmed. One-half the costs of this appeal are assessed to appellant, Pearle Optical of Alexandria, Inc., and the remaining one-half of such costs are assessed to plaintiff-appellant.
Amended and affirmed.