Mr. Justice McWilliams
dissents:
I dissent, as in my view the judgment of contempt should be affirmed.
On September 26, 1963, Burt, who is not an optometrist, was enjoined by the Denver District Court, after hearing, from “directly or indirectly” engaging in the practice of optometry as defined by C.R.S. ’53, 102-2-4. Additionally, Burt was also specifically enjoined from “fitting or adapting” contact lens to the human eye and from doing or performing “any act” or using any optical instrument to or for the purpose of fitting or adapting contact lenses to the human eye, without first having a license to practice optometry issued by the State Board of Optometric Examiners of the State of Colorado. Burt, incidentally, did not seek any review by us of the aforementioned injunctive order.
As noted, the injunctive order with which we are here concerned incorporates therein, by reference, C.R.S. ’53, 102-2-4, which statute defines the practice of optometry. Hence, brief mention should now be made of that particular statute. C.R.S. ’53, 102-2-4, defines the practice of optometry as including the following:
1. the examination of the human eye and the employment of any means, other than by use of drugs, medicine, surgery or x-ray, or any form of radiation, for the *199 purpose of determining any visual, muscular, neurological or anatomical anomalies of the eyes; and
2. the fitting or adapting of contact lenses to the human eyes.
On April 30, 1965, a contempt citation was issued which directed Burt to show cause, if such he could, why he should not be held in contempt for an allegedly willful violation by him on January 28, 1965, of the aforementioned injunctive order.
Upon trial of the matter the trial judge held that Burt had in fact generally violated the various terms and provisions of this injunctive order and accordingly adjudged Burt to be in contempt and fined him $250. The trial court specifically found that Burt did engage in the practice of optometry without a license, and that he had made a diagnosis of the fit of contact lenses to the eyes of the witness Seifert.
The majority of this court have now come to the conclusion that the record does not support the finding by the trial court that Burt had in fact violated the injunctive order theretofore entered against him. This is most definitely not my view of the record. On the contrary, I am of the firm belief that the evidence does support the finding of fact, as made by the trier of the fact, that Burt had indeed violated the terms and provisions of the injunctive order.
Specifically, I take decided exception to the conclusion of the majority-of the court that Burt in advising Seifert that his lenses were flat and beveled was only “examining and commenting on the physical characteristics of contact lenses” and that in so doing he was not in any manner expressing any “medical judgment.” Burt himself testified that in his examination of Seifert’s contact lenses he was attempting “to see how the lens fit in accordance to the cornea:” So, in expressing the opinion that Seifert’s contact lenses were flat and beveled, Burt was' not stating that the lenses were flat and beveled in any abstract sense of the word, but, -as he himself *200 testified, in his judgment they were flat and beveled in relation to the cornea.
Also, the majority opinion suggests to me, at least, that Burt in his examination of the witness Seifert was perhaps only working “as an ancillary technical assistant under the direct supervision of a licensed person.” I gain this impression from the language in the majority opinion that Burt was “an experienced optician who operated under the supervision of a licensed ophthalmologist as demonstrated by his referral of Seifert to a doctor.” This conclusion, in my view, is somewhat misleading and is not supported by the record. True, there was a licensed ophthalmologist who, like Burt, was an employe of the Vent-Air Contact Lens Center, but there is absolutely no evidence that this ophthalmologist was in any manner supervising Burt in his examination of Seifert’s contact lenses as they rested upon the corneas of Seifert’s eyes. In fact, there was evidence that the ophthalmologist was not even on the premises at the time. Hence, any “supervision” by the “absent” ophthalmologist was necessarily of the “remote control” variety. This, to me, does not constitute supervision.
Furthermore, the fact that, after Burt had concluded his examination of Seifert’s eyes with the latter’s contact lenses in place thereon and after he had, as will be mentioned below, informed Seifert, in effect, that his lenses no longer fit, Burt then told Seifert that he would have to return for an examination by the ophthalmologist looking toward the purchase of a new set of contact lenses does not in any manner exonerate Burt. In other words, at the time of the so-called “referral” Burt was already in violation of the injunctive order theretofore entered against him, and this “referral” did not operate as a remission of his prior acts.
In the over-all, the majority in my view tend to minimize the testimony which, when read in context, clearly shows that Burt did violate the injunctive order theretofore entered against him.
*201 As I read the record, Burt most certainly did examine Seifert’s eyes with his contact lenses in place; in conducting his examination Burt admittedly used certain “diagnostic instruments”; as a result of his examination Burt did express a “medical judgment,” or at least an optometrical judgment, when he, in effect, informed Seifert that his contact lenses no longer fit; and in thus examining and diagnosing Burt was not in anywise acting under the supervision of a licensed ophthalmologist.
In support of my appraisal of the evidence I quote liberally from the testimony of the witness Seifert. He testified, in part, as follows:
“Q. (By Mr. Flowers) What happened next, Dr. Seifert?
“A. Well, it was Mr. Burt who asked me into the office, and who later stated that his name was Burt, told me to be seated there, and we proceeded to talk about contact lenses. He asked me what my problems were. I told him that I had been fitted with contact lenses in Indiana about three or four years ago; and had worn the contact lenses very well for about two years; and that I moved out to Colorado and I attempted to wear the lenses then and I was having trouble with them. I wasn’t wearing the lenses at that time, and I asked him — I said, ‘Do you want me to put the lenses in?’ And he said, ‘Yes.’ I am sorry — no, this wasn’t exactly the way it was. First of all, he asked to look at the lenses; and I gave them to him in a metal case which I had them in. And he left for, oh, not more than two minutes, and came back and remarked something to the order, ‘There, that didn’t take long at all.’ He then proceeded to tell me that my lenses were crazed, and that this was a similar effect that a car windshield would get if the car was closed for any extended period out in the hot sun. I asked him if he wanted me to put the lenses in, and he said ‘Yes.’ Then he left again for a period of which I utilized (sic) necessary wetting solutions and things which he had on the table right aside *202 of the chair, and I put the lenses in. When he came back I had the lenses in and was looking at three certificates which were on the wall. These three certificates were all marked with the recipient as R. W. Strahan (S-t-r-a-h-a-n), and I believe, M.D. When he came back in I asked him if he was Dr. Strahan, and he said, ‘No, my name is Burt.’ Then I sat down in the chair again, and he put fluorescein in my eyes and viewed my eyes with a black light, or ultraviolet light. Then he proceeded to tell me that the lenses seemed a little flat, and that they also• had a rather large bevel on it, —■ well previous to this —■ also, when he had said that his name was Burt, we had a short discussion there as far as last names, and the difficulty I had with the spelling of my last name, being pronounced different than it is spelled. He then proceeded to tell me that the lenses were a little bit flat and viewed — well, this was when he was viewing them with the black light. He said that he didn’t want to criticize the person who fit the lenses in Indiana because in Indiana this may be a very good fit. He proceeded to tell me that he had people come from four or five states around concerning wearing his lenses, and that all of these people that he has only had, oh, only four or five failures concerning these fittings that he has done.
“I asked him if anything could be done to make the lenses feel better, or to solve my problems with these lenses, and he said no, because of this crazing that it would make it extremely difficult, and a risk, to do any sort of a modification on the lens. First of all, because the lens seemed a little flat; all he could do by modifying it is to make the lens a little bit flatter; and also there was a risk of chipping the lens because of this crazing; and did think it required a new pair of lenses.
“At this time he asked me what I was charged for my lenses in Indiana; and I told him that it was $190. And he gave an exclamation then that ‘certainly was a high *203 amount to pay.’ He said that his price for contact lenses, for two pair was $230.”
“I then asked him if he would —wait a minute — (witness stops to meditate momentarily) •—■ he said to refit me with one pair of contact lenses would be approximately 90 to $125. And I asked him then, ‘Why the change?’ ‘Why such a decrease in the one pair, and why the variation?’ He said this was due, first of all, because I had the desire to wear the contact lenses; and that I knew how to handle the contact lenses. I asked him why the variation between 90 and $125; and he said that this would be determined as to the results of the eye examination.
“I then asked if I could have an eye examination right now; and he said no, that he wouldn’t want to do any eye examination, but that this Dr. Strahan would do that. ‘Well,’ I said, ‘Could Dr. Strahan see me right now?’ And he told me that Dr. Strahan wasn’t in the office now, and that he wouldn’t be in for the remainder of the day. He did tell me that he felt that Dr. Strahan could see me the next day, and if I would want to make an appointment. I told him that I would have to talk over even an expenditure such as this with my wife.
“Then, I then implied I wanted to know if this — or, I then implied to Mr. Burt that I had more confidence in him than in this Dr. Strahan whom I had never met. And I asked him then if Dr. Strahan would fit me with the contact lenses, implying that I had more confidence in Mr. Burt He then said that Dr. Strahan would only give me the examination, and that he, himself, would fit the contact lenses. He then suggested that I seemed to be doing quite well wearing the lenses while I was talking, and that I wear the lenses out of the office. I then told him that I would have to check with my wife concerning the expenditure of 90 to $125, and that I would possibly call the office again to make this appointment for the next day.” (Emphasis supplied.)
*204 In my view, as I have already indicated, the foregoing testimony amply supports the conclusion that Burt conducted an examination of Seifert’s eyes with the contact lenses in place; that in his examination Burt used certain “diagnostic instruments,” namely fluorescein and ultra-violet light; that based on his examination Burt then made the diagnosis that Seifert’s lenses were “crazed,” flat and beveled and that they no longer fit him; and that Burt then tried to sell Seifert a new set, or possibly two new sets, of contact lenses.
It is quite true that Burt did not “adapt or fit” new contact lenses for the witness Seifert. But that is not the only manner by which Burt could be in violation of the injunctive order. Burt was enjoined from “directly or indirectly” engaging in the practice of optometry. In examining Seifert’s eyes with the old contact lenses in place, and in advising Seifert that they no longer fit, Burt certainly was in my view of the matter engaging in the practice of optometry. And in so doing he was acting in direct violation of both the spirit and the letter of the court’s injunctive order. In short, if Burt wasn’t engaging in the practice of optometry then I for one, don’t know what in Heaven’s name he was doing.
In his testimony Burt described himself as the office manager of the Vent-Air Contact Lens Center. This, then, in my view is an instance where the office manager departed from his traditional managerial duties and improperly strayed into the field of optometry. Burt had no license to practice optometry, and was moreover under a court order not to do so. For this he was quite properly adjudged to be in contempt of court.
Finally, I disassociate myself from the majority opinion for the additional reason that in my view it tends to minimize the importance of the profession of optometry. The underlying theme would seem to be that most anyone can practice optometry. Under applicable statutes, an optometrist to be licensed in Colorado must have graduated from a school or college which requires *205 an actual personal attendance of at least five years or not less than five thousand hours at college level, not less than three years and three thousand hours of which are in professional study. C.R.S. 1963, 102-1-8(3). Burt meets none of these educational requirements, and, as he said, his only college training was in the “College of Hard Knocks.”
In my opinion, though attendance at the “College of Hard Knocks” no doubt develops many commendable traits, such attendance does not qualify one to examine with the aid of diagnostic instruments contact lenses in place on the human eye and to then express the pseudo-professional opinion that the lenses do not fit because they are flat and beveled in relation to the cornea. If attendance in the College of Hard Knocks does qualify one to practice optometry, then the village blacksmith, by way of example only, may well be qualified to also practice optometry, or medicine, or chiropractic, or law. In my thinking one who desires to practice a profession, such as optometry, should be licensed and policed, not for the sake of licensing or policing, but for the protection of the general public.
Mr. Justice Frantz joins in this dissent.
Mr. Justice Schauer, formerly concurring, now joins Mr. Justice McWilliams in this dissent.