Norman FIELDS, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 4066.

District of Columbia Court of Appeals.

Argued March 6, 1967.

Decided July 25, 1967.

George Greenberg, Washington, D. C., with whom Morton Kudysh, Washington, D. C., was on the brief, for appellant.

John R. Hess, Asst. Corporation Counsel, with whom Charles T. Duncan, Corporation Counsel, Hubert B. Pair, Principal Asst. Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee.

Before HOOD, Chief Judge, MYERS, Associate Judge, and QUINN (Associate Judge, Retired).

HOOD, Chief Judge.

Appellant was convicted of practicing optometry without a license in violation of D.C.Code 1961, § 2–502 (Supp. V, 1966), which makes it unlawful to engage in the practice of optometry without a license.[1] The practice of optometry is defined by Section 2–501 of our Code as

> the application of optical principles through technical methods and devices in the examination of the human eye for the purpose of determining visual defects, and the adaptation of lenses for the aid and relief thereof.

The major question presented by this appeal is whether the adaptation and fitting of contact lenses constitute the practice of optometry within the meaning of Section 2–501.

Appellant has had some twenty years of experience as an optician, most of which

---

1. Persons selling spectacles or eyeglasses who do not attempt to adapt them to the eye, and do not practice or profess the practice of optometry are exempt from this provision. § 2–520(b).

has been in the District of Columbia, and has been licensed as such by the State of New York.[2] He has worked directly with several optometrists and has had training as a contact lenses technician. Subsequently, he entered into a partnership which operated two optical stores in the District of Columbia, one of which was the Embassy Optical Company.

In January of 1966 a Mrs. Crawford, hereinafter sometimes referred to as patient, visited the Embassy Optical Company to obtain contact lenses. Appellant informed her that Embassy would not fit her with contact lenses without a doctor's prescription. Several days later she again contacted Embassy and was referred to a local ophthalmologist[3] who, after examining her eyes, gave her the required prescription to return to Embassy. This prescription gave the readings necessary to fit eyeglasses. There was some conflict in testimony as to whether she was requested to return to the ophthalmologist after the fitting of contact lenses by appellant. According to Mrs. Crawford, the doctor told her she should return "only if you want," while

the doctor testified that he told her appellant would ask her to return.[4]

Mrs. Crawford took the doctor's prescription to Embassy where appellant then proceeded to fit her with contact lenses. The initial step in the fitting was to make certain measurements of her corneas by use of a keratometer. Once a keratometer is properly focused upon the eye, the operator is able to measure, as accurately as possible by instrument, the radius of curvature of the anterior surface of part of the cornea in order to determine the approximate curve of the eye.[5]

Through use of a conversion table the keratometer readings were converted into millimeter figures for the selection of the initial lenses tried on the patient. Appellant made a vital judgment at this point; i. e., whether the curvature of the particular lens should match the measurement obtained through use of the keratometer. He testified that

> the spectacle prescription given to me by the ophthalmologist will be effective if I use the same keratometer reading, if I

2. There is no optician licensing requirement in the District of Columbia. An expert witness testified that to be an optician in the District of Columbia one would only have to find a store, "go ahead and rent it, and call yourself an optician."

3. "An ophthalmologist is a duly licensed physician who specializes in the care of the eyes. An optometrist examines eyes for refractive error, recognizes (but does not treat) diseases of the eye, and fills prescriptions for eyeglasses. The optician is an artisan qualified to grind lenses, fill prescriptions, and fit frames." Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 486, 75 S.Ct. 461, 463, 99 L.Ed. 563 (1955).

4. Appellant admittedly had not done contact lenses work for this particular doctor. Accordingly, the doctor at most would be assuming that appellant would refer patients back to him. (The initial referral apparently resulted from their geographical proximity, the offices being "right around the corner.") She did re-

turn some time after appellant's arrest and her lenses were found "to be somewhat overcorrected."

5. The keratometer measures the meridian of greatest curvature and the meridian of least curvature. Using the measurements of the anterior surface of the cornea, the initial posterior curve (the back surface) for a contact lens can be determined. It appears that it may actually be impossible in some cases to obtain accurate measurements of the corneal curvatures with the keratometer as the surface of the cornea is not a smooth curve, but flattens out at varying distances from the center. CORNEAL CONTACT LENSES 105, 125 (Girard Ed.1964) [Hereinafter cited as CORNEAL]. There was expert testimony that the actual area of the cornea measured by a keratometer is approximately three millimeters while the total surface of the cornea is several times greater. Further testimony indicates that a contact lens' size is usually at least seven millimeters, so unmeasured areas of the cornea will necessarily be under a contact lens.

take it off this keratometer. Now, however, in the fitting of contact lenses, you don't use this curvature all the time. Occasionally, you may change this to get a better fit. You may make the fit of the lens a little deeper [steeper] or a little flatter, as was described by the other witnesses.[6]

Expert witnesses testified that in fitting a patient a decision must be made whether or not to exactly match the curvature given by the keratometer readings, or, for a better fitting, centering, or positioning of a lens, make the curvature steeper or flatter. Although there were slight differences in testimony on whether to use the exact keratometer readings in determining the curvature of a lens, it appears that changes have usually been made by the time a final lens has been prepared. In addition to taking these readings, appellant made certain measurements of the diameter of the cornea and the lid openings.

A contact lenses laboratory then prepared a set of trial lenses from the measurements and judgments made by appellant. The patient was informed that these lenses would not be her exact prescription, but were for determining the proper fit. Appellant testified that if you deviate from the keratometer readings to make the fit of a lens steeper or flatter

you have to change the power of the lens itself to allow for the change in curvature of the lens that is fitting on the eye, to approximate what is written on the prescription [of the prescribing doctor].

This is necessitated by the lacrimal or tear lens factor. When a contact lens is placed on the eye, one side is bordered by air and the other by the fluid tears, the latter, in effect, becoming a tear lens. When the curvature of the lens is made steeper in relation to the cornea, the negative power of the tear layer increases since the tear layer is deeper over the apex. When the curvature is made flatter, this power decreases as the tear layer is thinner over the apex. The vertex distance, how far the lens is in front of the eye, can be estimated and by reference to a vertex distance conversion table, changes made in the power of the lens. It appears that the correct estimate of the vertex distance is one of the larger sources of error when making a change in a spectacle prescription for the power of contact lenses.[7] Accordingly, depending upon the fit of the lens, the power usually varies from that of a prescription for spectacles. Appellant unequivocally testified that he changed the power of the lenses from that initially prescribed by the doctor.

It is not clear from the record at what point appellant determined the optical zone width and what was to be the diameter of the central optical zone of the lenses and their total diameters. These judgments were made by appellant, however. Further, he determined the central thickness of the lenses and the peripheral curves[8] to be incorporated.

Appellant testified that it was his procedure to get an unfinished lens containing only the power and base curvature from the laboratory. A secondary curve, any change in diameter and the finishing of the

6. In a deep (steep) lens, the distance between the central portion of the lens and the cornea is increased; or in other words, the lens vaults the apex. In a flat lens, the center of the lens is fitted closer to the cornea. CORNEAL 253–54.

7. CORNEAL 73, 129–30, 132. There was testimony at trial that the power of a contact lens cannot be accurately determined from a spectacle prescription, but

can only be accurately done by placing a lens of known power upon the eye and then through refraction determine what changes in power are necessary.

8. Peripheral and intermediate, or secondary, curves are used to blend the steeper curvature of the central area with the flatter edge of a lens. CORNEAL 28–31, 188–90.

edges would be done by his own company to "get exactly what we want." [9]

The patient was fitted with trial lenses approximately one week after these preliminary determinations by appellant. He inserted the lenses in her eyes, "with some difficulty," then applied a colored dye, fluorescein, to observe the fit of the lenses.[10] From his evaluations through use of fluorescein, appellant judged whether the lenses were fitting properly at this point. Approximately five days later the patient returned for another fitting and this time was instructed how to insert and remove the lenses.[11] She returned several days later for her final lenses and was further instructed on cleaning the lenses, their handling and storage.

· Appellant then gave the patient her lenses to take home and prescribed a schedule for her to wear the lenses in order to build-up her wearing-time. She was instructed to wear the lenses two, two and one-half, three and four hours on four consecutive days, and an appointment was made for the following week. In the event she "had trouble," she was to call him "day or night" at his home or office. She paid the remaining portion of her bill and left.

Appellant testified he intended to determine by subsequent examinations if the lenses were fitting properly and then send the patient to the prescribing doctor for his ultimate approval. Before this was done, appellant was arrested and charged with the unlicensed practice of optometry.

I

Appellant first contends that the government failed to establish beyond a reasonable doubt that he practiced optometry. His position is that since he did not make an examination of the eyes for the purpose of determining visual defects, he did not practice optometry within the meaning of our statute. In other words, since the statute is in the conjunctive, *and*, rather than the disjunctive, *or*, the government has to establish that he did both to support his conviction. We do not agree.

■ The purpose of the Act regulating the practice of optometry in the District of Columbia was to provide protection for the public. Evers v. Buxbaum, 102 U.S.App. D.C. 334, 253 F.2d 356 (1958); Silver v. Lansburgh & Bro., 72 App.D.C. 77, 111 F.2d 518, 128 A.L.R. 582 (1940).[12] This purpose includes protection from ignorance, deception, fraud and inexpertness, and logically covers either the examination of eyes for visual defects *or* the adaptation of lenses. We agree with appellee that appellant's construction would permit those unlicensed individuals who examined the eyes

9. A secondary curve had been put in, the diameter had been reduced and the edges finished on the lenses furnished the patient. The determination of what curves are to incorporated in a lens is especially important in regard to comfort. One expert testified that a proper edge would allow a patient to wear a lens with a faulty curvature for a brief period with no sensation of pain.

10. Fluorescein is used to evaluate the manner in which a lens is resting upon the cornea. The dye is applied above the lens and stains the tears in the eye, including the tear layer beneath the lens. (The tear layer is exceptionally thin. It supplies oxygen for the cornea and removes waste material. There must be an adequate flow of tears between the lens and the eye in order to maintain the proper metabolic state of the cornea.) By use of an ultraviolet or black light the effect of the lens upon the cornea can be evaluated through observation and analysis of the tear pattern. Through this procedure the area where a lens may be touching the cornea, instead of resting upon the tear layer, and where there are insufficient or excessive peripheral and intermediate curves can be observed. Whether a lens is too steep or flat is also evaluated. CORNEAL 253–61 (text and illustrations).

11. This was again accomplished with some difficulty as one of the lenses went off-center. After some effort, she properly relocated the lens herself.

12. See H.R.Rep. No. 410 and S.Rep. No. 388, 68th Cong., 1st Sess. (1924).

and then failed to adapt lenses to avoid the statutory prohibition.[13] It "is a well-recognized principle of statutory construction that the conjunctive and disjunctive are signified interchangeably if to do so is consistent with the legislative intent." New Jersey State Bd. of Optometrists v. Koenigsberg, 33 N.J.Super. 387, 110 A.2d 325, 328–29 (1954). The absurd results, at plain variance with the purpose of the Act, of appellant's construction persuade us that the legislature intended the examination and the adaptation to be separate acts of optometry.

■ Appellant further contends that the evidence produced by the government did not establish beyond a reasonable doubt that his acts violated the statute in question. For this proposition, he relies strongly upon a Pennsylvania case, Commonwealth v. Stemet, 21 Pa.Dist. & Co.R.2d 295 (1959), involving the narrow issue of whether measuring the curvature of the eye in order to grind contact lenses violated that State's optometry statute. Recognizing that when dealing with a statutory, and not a common-law, crime the conduct to be penalized must be proscribed by the clear wording of the statute, United States v. Capital Traction Co., 34 App.D.C. 592 (1910), we are convinced that the wording of our Act is clear on the conduct barred and, for reasons we will now discuss, that there was sufficient evidence to support the trial judge's finding that appellant had practiced optometry.[14]

## II

The major question is whether the fitting of contact lenses by appellant constituted "the adaptation of lenses for the aid and relief" of her visual defects. Even assuming that the keratometer is a measuring and not a diagnostic instrument,[15] appellant went beyond simple measurement of the patient's eyes and requesting of lenses on the bases of those measurements. It was at this point that he began to adapt lenses to her eyes. Judgments had to be made for the fit of the lenses beyond the areas measured by the instrument; changes were made in their base curvatures for the purpose of fit; changes were made in their powers as based upon his deviations from the instrument's exact readings; the sizes and optical zones of the lenses had to be judged; and the placing of curves in the lenses for the purpose of comfort (not power) had to be determined. Further, appellant inserted a colored dye into the eyes to observe tear patterns and thereby the position and effect of the lenses upon the eyes. Changes in the lenses would be based upon such observations. Without repeating the entire procedure by which appellant fitted the patient's lenses, it is clear that this involved areas of judgment and skill necessary to the adaptation of lenses within the meaning of our optometry statute.[16] This was much more than the technical preparation or sale of a pair of spectacles or eyeglasses.[17] Further, appellant prescribed the wearing schedule for the patient in building-up the wearing-time of her lenses. By directing the patient to call him "day or night" if she "had trouble," appellant acknowledged that difficulties may arise in the early wearing stages. This procedure would appear to vary with each patient.

■ In each of the steps by which the contact lenses were fitted, expertness and

13. See Blohm v. District of Columbia, D.C. Mun.App., 113 A.2d 111 (1955).

14. See Siegman v. District of Columbia, D.C.Mun.App., 48 A.2d 764 (1946).

15. There was testimony that it may have diagnostic value in patients with keratoconus. (In keratoconus the patient has a cornea with a conical protrusion making spectacles unsatisfactory. This is one condition for which contact lenses were originally designed.) There was further testimony that a keratometer is "primarily" a measuring instrument, indicating it does have additional uses. See also CORNEAL 306–07.

16. Appellant, as well as other witnesses, testified that the procedure involved judgments.

17. Thus, the exemptions set forth in § 2–520(b) are not applicable.

training were essential. The consequences of improper fitting, instructing, and follow-up observation are well documented. They include actual curvature changes of the cornea, painful abrasions and ulcerations of the cornea, infections, blindness and surgical removal of the eye.[18] The fitting of a contact lens is the introduction of a foreign body in immediate contact with a sensitive part of the body, the cornea, which can result in serious injury. This was a consequence which well might have flowed from appellant's unsupervised fitting. Without belaboring the point, we feel that the actual fitting of contact lenses is the adaptation of lenses within the meaning of our optometry statute. Placing a foreign object upon the surface of the cornea may have consequences far more immediate and serious than the prescribing for, and adaptation of, spectacles or eyeglasses worn some distance from the eye.

In 1951 the District of Columbia Board of Commissioners ordered that future applicants for optometry licenses be examined in the "theory and practice of contact lens' fitting." This was recognition that the public should be protected from improper fitting of contact lenses by *optometrists,* and that contact lenses fitting constitutes the practice of optometry. While not bound by the interpretations of the Commissioners, and the subsequent acquiescence of the legislature in such rulings, they are worthy of some weight in our deliberations.[19]

We are aware there is a split of the authority in other jurisdictions on this issue. In High v. Ridgeway's Opticians, 258 N.C. 626, 129 S.E.2d 301 (1963), it was held that under North Carolina statutes opticians could fit contact lenses when prescribed by a physician, oculist, or optometrist, and the patient returned to the examining professional for further examination. However, the court took note that in North Carolina opticians were specifically permitted to *measure, adapt, fit,* and *adjust* lenses after being licensed. To be licensed an applicant had to pass an examination in various fields of the optician's skills as well as the practical anatomy of the eye.[20]

Also, in State Board of Optometry v. Chester, 251 Miss. 250, 169 So.2d 468 (1964), an injunction was granted against an optician for fitting contact lenses without a prescription. The court stated that it would have been proper had the optician acted under prescription. It is interesting to note that two ophthalmologists testified in that case that they did the fitting in their own offices and that even optometrists were not qualified to fit contact lenses.

There is strong authority in accord with our decision. In State ex rel. Reed v. Kuzirian, 228 Or. 619, 365 P.2d 1046, 88 A.L.R.2d 1284 (1961), it was held that fitting contact lenses was the practice of optometry under the Oregon statutes and an optician was properly enjoined from such practice. (One of the bases used by the court in High v. Ridgeway's Opticians, supra, to distinguish this holding was that Oregon had no licensing requirement for opticians.) The Oregon court did rule that an optician could fit contact lenses when acting under the *direct personal supervision* of legally qualified personnel.

In Ketring v. Sturges, 372 S.W.2d 104 (Mo.Sup.Ct.1963), it was held that in view of an agreed statement of the parties and

18. See 195 J.A.M.A. 901–03 (1966); 1 Brit.Med.J. 751–52 (1966); 55 So.Med. A.J. 862–69 (1962).

19. Hearings on ten identical bills to amend the laws governing the practice of optometry in the District of Columbia were held in 1966 by Subcommittee No. 4 of the House of Representatives Committee on the District of Columbia. The Committee did not report out any of the bills. The Commissioners' order was brought to the attention of the members of the Committee by various witnesses.

20. The court apparently felt that insertion and removal of a contact lens was a "merely routine procedure." Id. at 305. For the possible consequences to the cornea due to the improper removal of contact lenses, see the illustration on page 865 of Vol. 55, So.Med.A.J.

the absence of a statute authorizing opticians to measure the eyeball, insert and adjust contact lenses, the fitting of such lenses constituted the practice of optometry.

Also, in New Jersey State Bd. of Optometrists v. Reiss, 83 N.J.Super. 47, 198 A.2d 816 (1964), it was held that fitting contact lenses was the practice of optometry within the meaning of the New Jersey statutes and, further, that it was no defense that the optician doing the fitting was doing so under a doctor's prescription, even though the doctor had pronounced the work satisfactory three weeks after completion. It was recognized that the "crucial period requiring professional supervision was at the time of the adaptation of the lenses, their initial adjustments and the early stages of wearing." Id. at 822. The court also noted that the fitting of the lenses involved an immediate exposure to possible eye damage which required professional skill and judgment.

Other decisions in this area are Louisiana State Bd. of Optom. Exam. v. Pearle Optical of Alexandria, Inc., 177 So.2d 164 (La. App.1965), annulled on other grounds, 248 La. 1062, 184 So.2d 10 (1966), where advertisements that "personnel will be happy to discuss contact lenses with you" were held to be a violation of a statute barring advertisements of optometric services; Delaware Optometric Corp. v. Sherwood, 36 Del.Ch. 223, 128 A.2d 812 (1957), where it was conceded by a group of opticians that fitting contact lenses was an act of optometry; Kelley ex rel. Michigan Bd. of Exam. in Optometry v. Peterson, 4 Mich. App. 612, 145 N.W.2d 386 (1966), enjoining unsupervised opticians from fitting contact lenses, even though a separate criminal action could have been brought; and Burt v. People ex rel. Dunbar, 421 P.2d 480 (Sup. Ct.Colo.1966), reversal of a finding that an optician violated an injunction barring his fitting or adaptation of contact lenses.

■ The wording and purpose of our optometry statute convince us that the fitting of contact lenses by the appellant was the adaptation of lenses within the meaning of that provision. Appellant's contention that he would have referred the patient back to the prescribing doctor does not excuse his practice of optometry at the time of fitting.[21]

The present optometry statute for the District of Columbia was originally enacted in 1924 while the wearing of contact lenses did not come into general use until about twenty years later. Our decision is based upon the clear wording and purpose of the statute as enacted. It may well be that the Congress should take some further review of the problems involved in the adaptation and fitting of such lenses.

Affirmed.

21. Our decision does not bar an optician from grinding, or fabricating, contact lenses in accordance with a complete prescription furnished by a doctor, and delivering the lenses to the doctor for fitting.