33 N.J. Super. 387 (1954)
110 A.2d 325
NEW JERSEY STATE BOARD OF OPTOMETRISTS, PLAINTIFF-RESPONDENT,
v.
HILDA L. KOENIGSBERG, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 6, 1954.
Decided December 23, 1954.
*389 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. William K. Miller, Deputy Attorney-General, argued the cause for the respondent (Mr. Grover C. Richman, Jr., Attorney-General, attorney).
Mr. James A. Major argued the cause for the appellant.
The opinion of the court was delivered by FRANCIS, J.A.D.
Appellant was found guilty of practicing optometry without a license in violation of R.S. 45:12-1, 19, as am. L. 1948, c. 350. She appeals, admitting the absence of a license, but contending that the acts or practices in which she engaged are not covered by the statute.
The record discloses that Dr. John J. Brown, a representative of the State Board of Optometrists, visited the office of the defendant, which is located in her home in Bergen County. Without disclosing his real identity, he complained of being nearsighted and wanted to know if she could do anything to avoid the need for glasses. She then inquired as to his general health, the length of time he had been wearing glasses, whether he suffered from headaches or wore sun glasses and if strong light bothered his eyes. He responded that he had been wearing glasses for 25 years during which period the lenses had been changed on 10 or 12 occasions.
Defendant then engaged in an eye examination by the use of (a) a cardboard chart designated "Your Chart" which contained several sentences consisting of words of varying size letters. Dr. Brown and an expert witness called by the board, described this card as a form of Snellen chart commonly used by optometrists and ophthalmologists for the purpose of examining eyes and measuring vision; (b) a septum apparatus consisting of a wooden board about three *390 feet long and five inches wide on which two letter "L"s had been placed at a point where each one would be in front of one of the subject's eyes. This instrument was placed about 13 inches away from his eyes and he was asked if the two L's combined to form one; (c) a pair of multiple pinhole spectacles made of a plastic frame mounted with opaque black fiber discs instead of lenses, each disc containing numerous apertures, pinhole in size. With these spectacles on, he was asked to look again at the chart, which was held eight feet away. When he advised defendant that he was then able to see the letters thereon she said it indicated the amount of vision he would be able to attain by completing her course of "training"; (d) a shallow wooden, rectangular box containing plastic tiles, each bearing a letter of the alphabet. After this was placed in front of Dr. Brown, he was told to pick up a tile, look at the letter on it and then inform the defendant where that letter appeared on a chart located on an easel about eight feet from his eyes.
At the conclusion of this examination, Miss Koenigsberg advised Dr. Brown that he was myopic and that his fusion ability was poor. She gave him a "lesson" in accordance with a printed form which was introduced in evidence. This document outlined a rather elaborate and detailed series of eye exercises and concludes with the statement: "These relaxation techniques though simple, are prime essentials in obtaining mobility of sight."
The fee for the examination was $10. The expert optometrist called by the board testified that in using the instruments described, the defendant had examined Dr. Brown's eyes within the contemplation of his profession.
The trial court found that the examination of Dr. Brown's eyes and the measurement of his powers of vision were performed for the purpose of testing his visual habits, ultimately improving them and lessening, if not entirely eliminating, the need for eye glasses. It was further found that defendant's purpose was not to adapt lenses or prisms for the aid of his vision. However, she was declared guilty of practicing optometry within the meaning of R.S. 45:12-1, as *391 am. L. 1948, c. 350, in that she did examine the eyes of Dr. Brown and did use certain means for the measurement of his "powers of vision."
Appellant's position can be concisely stated. She contends that, under the statutory definition, no person can be convicted of practicing optometry unless in addition to examination of the eyes there is an undertaking to adapt "lenses or prisms" for the relief of any deficiency revealed thereby.
Obviously, there can no longer be any controversy about the legal propriety of requiring a license to practice optometry or of prescribing reasonable regulations for the practice of that statutory profession. New Jersey State Board of Optometrists v. S.S. Kresge Co., 113 N.J.L. 287 (Sup. Ct. 1934), modified 115 N.J.L. 495 (E. & A. 1935); Abelson's, Inc., v. New Jersey State Board of Optometrists, 5 N.J. 412 (1950). It follows also that the field of regulation is circumscribed by the legislative definition of optometry. State ex rel. Booth v. Beck Jewelry Enterprises, 220 Ind. 276, 41 N.E.2d 622, 141 A.L.R. 876 (Sup. Ct. 1942).
The statute, R.S. 45:12-1, as am. L. 1948, c. 350, defines optometry to be:
"* * * The employment of objective or subjective means, or both, for the examination of the human eye for the purpose of ascertaining any departure from the normal, measuring its powers of vision and adapting lenses or prisms for the aid thereof. A person shall be deemed to be practicing optometry within the meaning of this chapter who in any way advertises himself as an optometrist, or who shall employ any means for the measurement of the powers of vision or the adaptation of lenses or prisms for the aid thereof, * * * or to use testing appliances for the purpose of the measurement of the powers of vision or diagnose any ocular deficiency or deformity, visual or muscular anomaly of the human eye or prescribe lenses, prisms or ocular exercise for the correction or the relief thereof or who holds himself out as qualified to practice optometry. * * *." (Italics added.)
In support of her contention, appellant points to the word "and" in the first sentence of the act. She claims therefore that the practice of optometry requires examination of the human eye, measuring its powers of vision and "adapting *392 lenses or prisms for the aid thereof," and that unless the testing is done for the purpose of prescribing corrective glasses, no license is required. More specifically with respect to the factual situation presented here, she urges that where the examination is performed not for the purpose of prescribing glasses, but to determine if some departure from the normal vision exists and then to prescribe exercises to reduce or eliminate the abnormality and thus avoid glasses or reduce the strength of the lenses being used or eliminate them entirely, optometry is not being practiced.
In answer to this argument the prosecution relies upon the second sentence of the section, which is said to contain a break-down of the general definition by reciting in the disjunctive the various acts which shall be deemed to be included in the field of practice of optometry.
In studying any statute a court should endeavor to give it an interpretation which best serves the entire legislative plan represented thereby. J.B. Wolfe, Inc., v. Salkind, 3 N.J. 312, 319 (1949). Of course, since the enactment in question is a penal statute, the construction adopted must emanate from a clearly expressed legislative purpose to that effect. New Jersey State Board of Optometrists v. S.S. Kresge Co., supra, 113 N.J.L. 287, 294 (Sup. Ct. 1934).
The general aim of the legislature evidenced by the act is to protect the public against ignorance, incapacity, deception and fraud in connection with the care and preservation of a vital and delicate human organ. Abelson's, Inc., v. New Jersey State Board of Optometrists, supra. In seeking to effectuate that object, the proper judicial approach should be not technical, but rather realistic and humane. There should be no disposition to adopt a narrow and constricted view as to what activities are comprised within the practice of optometry as it is delineated in the statute.
The history of this legislation portrays a progressively broader concept of optometrical activities. When the act was adopted in 1914, the practice was defined to be "the employment of any means, other than the use of drugs, for the measurement of the powers of vision and the adaptation of *393 lenses for the aid thereof." L. 1914, c. 222, § 1. In 1919, the definition was amended to be "the employment of objective and subjective means for the examination of the human eye for the purpose of ascertaining any departure from the normal, measuring its powers of vision and adapting lenses for the aid thereof." L. 1919, c. 59, § 1. In 1923, an amendment was enacted to ban employees or students of an optometrist from practicing or attempting to practice optometry, and to provide that any person who represents himself as qualified to practice the science shall be deemed to practice it within the meaning of the act. L. 1923, c. 106, § 1. Then in 1932 the present comprehensive statement as to what shall be deemed to be the practice of optometry was included. L. 1932, c. 75, § 1. The only difference between this amendment and the final one, which is the present R.S. 45:12-1, as am. L. 1948, c. 350, is that in the 1932 act "and/or" appeared between "objective" and "subjective" instead of "or both" after "subjective" as at present, and "and/or" appeared between "lenses" and "prisms" instead of "or" as at present. And it is noted that the statement appearing on the 1932 amendment at the time of its introduction in the legislature set forth the object as "to more definitely and clearly define the practice of optometry."
Thus it is patent that, even though the Legislature may be said to have retained in the first sentence of section one of the act an overall definition of optometry (Abelson's, Inc., v. New Jersey State Board of Optometrists, supra, 5 N.J. at page 418, 419; cf. McNaughton v. Johnson, 242 U.S. 344, 346, 37 Sup. Ct. 178, 61 L.Ed. 352 (1917)), for regulatory and public protection purposes the intention was to set out the various individual activities which should be deemed to demonstrate that a person was practicing optometry.
The matter would be less open to question if the wording of our statute were like that of Indiana, which says:
"The practice of optometry is hereby defined to be any one of the following acts, or any combination, of or parts of the following acts." Acts, 1935, c. 38, § 4, § 63-1004, Burns, 1933 Supp., § 13174, Baldwin's Supp. 1935. *394 Or if as in the California act the clause relating to the adaptation of lenses were separated by "or" instead of "and." McNaughton v. Johnson, supra.
We agree that the long amendatory sentence which lists in the conjunctive the various acts constituting optometry is subject to criticism from the standpoint of construction. We agree also that the "and" in the first sentence leaves something to be desired in the way of surface consistency with the various "or's" in the amendment, even though it is a well recognized principle of statutory construction that the conjunctive and disjunctive are signified interchangeably if to do so is consistent with the legislative intent. Murphy v. Zink, 136 N.J.L. 235 (Sup. Ct. 1947), affirmed 136 N.J.L. 635 (E. & A. 1948); Union Starch & Refining Co. v. National Labor Relations Board, 186 F.2d 1008, 27 A.L.R.2d 629 (7th Cir., 1951); Elliott Grocer Co. v. Field's Pure Food Market, 286 Mich. 112, 281 N.W. 557, 118 A.L.R. 845 (Sup. Ct. 1938); City of Knoxville v. Gervin, 169 Tenn. 532, 89 S.W.2d 348, 103 A.L.R. 877 (Sup. Ct. 1936); 2 Sutherland, Statutory Construction, 451 (3rd ed. 1943). However, we have no doubt that the legislative object was to individuate the acts constituting the practice of optometry, and in our judgment that object sufficiently emerges from an examination of the whole section so as to exclude the idea that the practice of optometry is not proven unless an eye examination is made for the sole purpose of adapting lenses to the correction of any abnormality revealed thereby.
If the word "and" were given its literal and technical meaning, not only would the disjunctive clauses in the next sentence be emptied of significance but absurd results would follow. A person who examined the eyes to discover or diagnose "any ocular deficiency or deformity, visual or muscular anomaly" thereof, under appellant's thesis, would not be violating the act unless the need for glasses or the prescribing of glasses were the end in view. What then would become of the very next disjunctive clause, manifestly indicating *395 that a prescription of "ocular exercise" for any deficiency shall be deemed to be the practice of optometry?
Under the evidence presented in this case, appellant must be deemed to have been practicing optometry within the contemplation of the act for any one or all of the following reasons:
(1) She employed subjective means for the measurement of Dr. Brown's powers of vision;
(2) She used testing appliances for the purpose of measurement of the powers of vision and to diagnose any ocular deficiency or deformity, or visual or muscular anomaly of his eyes, and she did diagnose his condition as myopia and poor fusion ability (even though she did not diagnose any underlying disease or condition as the producing cause thereof).
(3) She prescribed ocular exercises for the correction or relief of the myopia and poor fusion ability.
The judgment of conviction is affirmed.