**Stacy EVERS, Appellant,**

v.

**Herbert A. BUXBAUM, t/a Rubin Optical Company, and Dr. Joseph Friedman, Appellees.**

**No. 13903.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 13, 1957.

Decided March 6, 1958.

Petition for Rehearing In Banc Denied April 1, 1958.

Mr. Ralph F. Berlow, Washington, D. C., with whom Messrs. William T. Hannan, Joseph F. Castiello, and Kent D. Thorup, Washington, D. C., were on the brief, for appellant.

Mr. Harold J. Nussbaum, Washington, D. C., with whom Mr. Nathan M. Lubar, Washington, D. C., was on the brief, for appellee Buxbaum.

Mr. Alfred M. Schwartz, Washington, D. C., for appellee Friedman.

Before WILBUR K. MILLER, FAHY and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

When this suit was brought, appellant's eyesight had become seriously impaired, with blindness in the right eye, allegedly due to the fault of the appellees. The complaint charged that the appellees, both inaccurately described as optometrists, were negligent in their treatment of the eye condition for which appellant had consulted them in that they failed "to discover and/or timely advise [him] of the presence of a tumor." A second count, incorporating the allegations of the first count, additionally charged that appellees had represented that appellant needed eyeglasses, a representation alleged to have been knowingly false. Both appellees answered, refuting appellant's allegations, and pleading separate defenses. Friedman denied he had treated Evers and, in substance, set up that he, as a licensed optometrist, acting only in behalf of the unlicensed Buxbaum, had examined appellant's eyes and reported back the type of lenses required for improving appellant's vision. Buxbaum's answer, in substance, further denied that he practiced optometry, and averred that he had made no representations as to assisting appellant's vision

with eyeglasses, and that the glasses he delivered to appellant were made as prescribed by Friedman to reflect what Evers himself represented during Friedman's taking of measurements as improving appellant's "visual acuity to the best possible extent." Both appellees filed motions for summary judgment. The District Court concluded that appellant had no "cause of action" and "accordingly there does not exist any triable issue." Judgments having been entered for the appellees, this appeal followed.

This was not a case for summary judgment, which, the Supreme Court has pointed out, is authorized "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial, and that the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try. [Citing cases]"[1]

The appellees, as moving parties, had the burden under a strict standard of showing the absence of any genuine issue as to all material facts; indeed all inferences of fact from the proofs available must be drawn against the movants and in favor of the appellant here.[2] Moreover, the movants must establish that they are entitled to their judgments as a matter of law.[3]

The factual allegations of the complaint, when aided by the answers, the exhibits and such portions of the depositions as have been submitted, spell out a claim for relief which stemmed originally from appellant's visit on April 28, 1956, to the Rubin Optical Company conducted by the appellee Buxbaum, an optician, who had no license to practice optometry. According to the Evers dep-

1. Sartor v. Arkansas Gas Corp., 1944, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967; Dewey v. Clark, 1950, 86 U.S. App.D.C. 137, 143, 180 F.2d 766, 772.

2. 6 Moore, Federal Practice ¶ 56.15 (2d ed. 1953).

3. Fed.R.Civ.P. 56(c), 28 U.S.C.A. We are no longer constrained by purely formal and legalistic statements of "causes of action." It is sufficient if the pleaded facts state a claim for which relief may be had, Rule 8(a) (2), Hickman v. Taylor, 1947, 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451, having in mind that a plaintiff must seek to vindicate a right or to remedy a wrong. Gold Seal Co. v. Weeks, 1954, 93 U.S.App.D.C. 249, 256, 209 F.2d 802, 808.

osition, appellant then told Buxbaum: "I was having trouble with my eyes and I wanted to get them examined and see if I needed glasses." Buxbaum replied that his "doctor" was on vacation but that he could call a doctor nearby "who would examine my eyes for [Buxbaum]." Pursuant to telephonic arrangements made by Buxbaum, Evers went as directed to appellee Friedman who maintained a competing optical business nearby. Friedman, a licensed optometrist,[4] undertook at Buxbaum's request, to make an examination of appellant's eyes and to report to Buxbaum. Friedman's examination included the use of measuring apparatus and charts which he asked appellant to read with advices to Friedman as to the extent of his vision, thus tested. Friedman told Evers nothing about the results of his examination. He telephoned to Buxbaum, however, and outlined to Buxbaum a prescription for the attainment of appellant's best visual acuity. He also told Buxbaum, but not Evers, of the existence of a "possible Pathology." Buxbaum duly recorded:

"Dr. F. suggests recommending ophthamologist"[5] (sic) either to a private doctor or to the Episcopal Eye, Ear & Throat Hospital.

In Silver v. Lansburgh & Bro.[6] we concluded that a corporation in the District of Columbia may lawfully employ a licensed optometrist. While deciding that the practice of optometry failed to rise to the level of a professional relationship such as that between a physician and his patient or an attorney and his client, we nevertheless recognized that the primary purpose of the regulatory statutes "was to insure that the service would be rendered by competent and licensed persons and thereby to protect the public from inexpertness."[7]

The District Code denounces as unlawful and as a misdemeanor the practice of optometry without a license.[8] Implicit in the very fact of regulation, as the Silver case makes clear, is the Congressional policy that the optometrist be competent and that the public be protected from "inexpertness." The Code

---

4. See Chapter 5—Optometrists, D.C.Code §§ 2–501–522 (1951). Even qualified optometrists are forbidden to practice medicine or to engage in the treatment of the eye or "of the diagnosis of diseases of * * * the human eye." Id. § 519. Applicants seeking licenses must be examined in specified respects including "(c) Anatomy and physiology and such pathology as may be applied to optometry." Id. § 511. If an optometrist must exhibit such knowledge to qualify, we may assume he is expected to refer for treatment such cases as he recognizes may require it. "Moreover, the complaints do not show that a supervision of sales of spectacles by optometrists * * * who will be in position to inform [the customer] as to eye troubles which cannot be remedied by magnifying glasses, is not a step in the public interest." D. S. Kresge Co. v. Ottinger, D.C.1928, 29 F.2d 762, 765, affirmed sub nom. Roschen v. Ward, 1929, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722, where Mr. Justice Holmes, commenting on the New York statute, said: "If we assume that an examination of the eye is not required in every case it plainly is the duty of the specialist to make up his mind whether one is neces-

sary and, if he thinks it necessary, to make it."
And see excerpts from Friedman's deposition, infra.

5. "An ophthalmologist is a duly licensed physician who specializes in the care of the eyes. An optometrist examines eyes for refractive error, recognizes (but does not treat) diseases of the eye, and fills prescriptions for eyeglasses. The optician is an artisan qualified to grind lenses, fill prescriptions, and fit frames." Williamson v. Lee Optical Co., 1955, 348 U.S. 483, 486, 75 S.Ct. 461, 463, 99 L.Ed. 563.

6. 1940, 72 App.D.C. 77, 111 F.2d 518, 128 A.L.R. 582.

7. Id. 72 App.D.C. at page 79, 111 F.2d at page 520; we so interpreted the legislative plan and the purpose to be accomplished. Compare New Jersey State Board of Optometrists v. Koenigsberg, 1954, 33 N.J.Super. 387, 110 A.2d 325, 328: "The general aim of the legislature evidenced by the act is to protect the public against ignorance, incapacity, deception and fraud in connection with the care and preservation of a vital and delicate human organ."

8. D.C.Code § 2–502 (1951).

itself makes a distinction between the optometrist and "persons selling spectacles and (or) eyeglasses * * *." [9] The Congress in prescribing a plan of licensing as to optometry "was not dealing with traders in commodities, but with the vital interest of public health"[10] to the end that there might be afforded "protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief." [11] The public policy considerations so outlined by Mr. Chief Justice Hughes are no less vital when applied, in principle, to those who would render services in connection with so essential and delicate an organ as the human eye. We would not read the Silver case as implying that high standards of quasi-professional conduct are not to apply simply because we there decided that a corporation might render services to the public through licensed optometrists in its employ.

Here for all practical purposes the optometrist Friedman joined the optician Buxbaum for the accomplishment of a business result, common to both, for which a charge was to be made which both would share. Buxbaum could not measure the visual acuity of Evers. Friedman did not have the customer who had consulted Buxbaum. Appellees' respective counsel properly conceded when questioned that it made no difference whether Friedman rendered his services in Buxbaum's establishment or in his own. As the consulted optician, Buxbaum had undertaken an affirmative line of conduct, and throughout he was under an affirmative duty accordingly to take whatever precautions were reasonably required to protect Evers from negligence stemming from that conduct. He certainly knew that Evers had consulted him to have his eyes examined and to see if he needed glasses. He likewise knew that the "doctor" had found a possible pathology and had suggested recommending that Evers consult an ophthalmologist. Buxbaum made no such recommendation. He sold the trusting Evers eyeglasses for which he charged $27, remitting $5 to Friedman. Had he advised Evers to consult a specialist in accordance with Friedman's recommendation, he might not have sold the glasses. Evers might in that circumstance have consulted a specialist who might have detected earlier, as he did later, the real source of what Friedman identified as a pathological case. Buxbaum was warned, Evers was not. This appellee can now scarcely be heard to say that, because he himself was unlicensed, he can be justified in withholding information which if disclosed might have lost him a customer. We need not be concerned with fine distinctions between "misfeasance" and "nonfeasance." The simple subsisting fact is that when he was under a duty to speak he chose not to do so.[12] To say shortly that such conduct may give rise to one of the essential elements of a claim for which relief may be had can hardly be assailed.

Much of what has been said applies with even greater force to the licensed

---

9. D.C.Code § 2–520(b) (1951) specifies that the provisions of Chapter 5 shall not apply to those merely merchandising eyeglasses and "who do not attempt either directly or indirectly to adapt them to the eye."

10. Semler v. Oregon State Board of Dental Examiners, 1935, 294 U.S. 608, 612, 55 S.Ct. 570, 572, 79 L.Ed. 1086.

11. Ibid.

12. When Evers tried on the glasses and told Buxbaum that he failed to note any improvement, Buxbaum "said for me to wear the glasses and get used to them and that my eyes would adjust themselves, or that I would get to where I could see later on."

No claim has here been urged with reference to D.C.Code § 28–1115(1) (1951) which reads in part: "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment * * * there is an implied warranty that the goods shall be reasonably fit for such purpose." Cf. Gilbert v. Louis Pizitz Dry Goods Co., 1939, 237 Ala. 249, 186 So. 179, 182; Frank R. Jelleff, Inc., v. Braden, 1956, 98 U.S.App.D.C. 180, 187–188, 233 F.2d 671, 678–679.

Friedman. He questioned Evers as to his condition and his personal habits. He had examined the appellant within the limits of the skills he was licensed to exercise. He found, as his deposition discloses, that Evers with his right eye was not able to read the 20/200 letter, the large "E" on the chart.

Excerpts from his deposition will demonstrate additional background. Friedman recognized that Evers was a pathological case, suffering from what Friedman believed to be a "chronic retrobulbar neuritis. This · in itself is a pathologic case. The * * * glasses did help the patient to a degree * * * between twenty-five and thirty percent * * *. [I]f glasses do not improve a person's vision in a pathologic case at least twenty percent, at least two lines, we do not prescribe glasses. We only prescribe glasses where the visual acuity is increased." But Friedman knew, clearly, that "He should be referred to a medical doctor or an ophthalmologist, someone who is more trained for further study and investigation to look into this." Later he added. "There was enough pathology not to go any further. The man was a pathologic case. * * * I am not a medical doctor, I am not a brain surgeon nor a neurologist, and I can't go any further. I am trained just so much." Friedman explained that he kept no records since Buxbaum was a competitor. "Since this man is not my patient directly, but I was helping Mr. Buxbaum in the examination of this man, all the information is phoned to Mr. Buxbaum. The patient is not told anything in our office, since he is not our patient; he is Mr. Buxbaum's." Thus, Friedman would absolve himself—he had been employed by Buxbaum—not by Evers. We do not understand that as a licensed optometrist he may thus be freed of responsibility or that he may compose his own standard and thus be shielded. His own testimony disclosed a limit beyond which he himself would not go in a pathological case when so recognized in one of his own customers. Whether that standard so defined is one generally applicable in the District of Columbia by those possessed of an optometrist's skill is a matter of proof on which the record here is silent. We are left in no doubt on this much—when he identified a pathological case here, he remained silent.

Enough has been said to indicate the basis upon which Evers placed himself in the care of both appellees. Certainly Friedman with his greater training, and Buxbaum to whom the information was imparted, could be found to have failed Evers at a critical point, despite appellant's reliance upon them. When the public, including Evers, might have expected under the Code to be protected against "inexpertness," [13] his vulnerability was compounded. Reliance· by Evers upon these men was reasonable and foreseeable by the appellees. They also are chargeable with the not unreasonable likelihood of the consequences of Evers' attempting to get adjusted to the glasses when he should have been in the hands of. an ophthalmologist.[14]

The facts as to Evers' later visit to the appellees and other details of the relationship between appellant and the appellees need not now be developed. The record shows that Evers finally on July 30, 1956, went to Episcopal Eye, Ear & Throat Hospital complaining of failing vision in the right eye. The hospital report disclosed, apparently in October, a final diagnosis of optic atrophy of that eye. A summary of the records of the George Washington University Hospital indicates that, meanwhile, on August 3, 1956, Evers was admitted with a pathological diagnosis of "papilloma of choroid plexus," and that a tumor about the size of a large walnut was removed. When the patient was discharged on August 20, 1956, he was "able to read with his left eye with continued loss of vision in his right eye, otherwise improved."

13. Silver v. Lansburgh & Bro., supra note 6, 72 App.D.C. at page 79, 111 F.2d at page 520.

14. 2 Harper & James, Torts § 18.6 (1956).

This case did not require that Friedman make a correct diagnosis—even if by law he had been permitted to make one. The question is whether or not in execution of the duty the appellees owed to Evers, under all the circumstances, they reasonably were required to impart to him the existence of a recognized need that he consult a doctor who might make the correct diagnosis. We cannot know whether or not if appellant had been referred to an ophthalmologist on April 28, 1956, the tumor was then discoverable, or, if so, whether or not surgery at that early date could have led to the saving of the sight of his right eye.[15] Whether or not Evers was actually induced by fraudulent misrepresentations to purchase the glasses, however tenuous

the claim on the record here, is a matter of proof. The case never reached the point where evidence in such particulars might have been adduced. We therefore are likewise unable to consider whether or not the conduct of the appellees constituted the legal cause of the appellant's ultimate loss of vision in his right eye. Evidence as to all such issues must be developed in a trial whereupon the appellant may prove he is entitled to go to the jury.

It seems indisputably clear, on the record before us, this was no case for summary judgment.

Reversed.

WILBUR K. MILLER, Circuit Judge, dissents.

---

15. Cf. Hampton v. Brackin's Jewelry & Optical Co., 1939, 237 Ala. 212, 218, 186 So. 173, 179, where on undisputed evidence the disease of the plaintiff's eye was not such that it should have been detected by the optometrist. "And, therefore, he did not breach a possible duty in that connection."