James D. SANDEFUR, O.D., and W. E. Marrionneaux, Jr., O.D.

v.

William A. CHERRY, M.D., Secretary of the Louisiana Dept. of Health & Human Resources, and Bonnie Smith, Medical Services Director of the Louisiana Dept. of Health & Human Resources.

Civ. A. No. 80–64.

United States District Court, M. D. of Louisiana.

Aug. 18, 1982.

Henry B. Bruser, III, Gold, Little, Simon, Weems & Bruser, Alexandria, La., for plaintiffs.

Charles L. Patin, George F. McGowin, La. Dept. of Health & Human Resources, Baton Rouge, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**JOHN V. PARKER, Chief Judge.**

The Plaintiffs, doctors of optometry, are duly licensed to practice in Louisiana, and they are authorized providers of eye health care services under Title XIX of the Social Security Act—"Medicaid," 42 U.S.C. § 1396 et seq.

The Defendant, George Fischer, substituted by amended complaint filed July 14, 1980 for William A. Cherry, M.D., is Secretary of the Department of Health & Human Resources of the State of Louisiana and is the state official charged with the administration of the State Plan for Medical Services, and Defendant, Bonnie W. Smith, is Medical Services Director of the Louisiana Department of Health and Human Resources and is a state official charged with the administration of the State Plan for Medical Services.

Defendant, State of Louisiana, through the Department of Health & Human Resources, added by amended complaint, is the executive department charged with the formulation and administration of the State Plan for Medical Services. The Department is further charged under applicable state law with the administration of all health and human resources programs on behalf of the State, including, but not limited to, the state charity hospital system and parish public health units throughout the state.

Plaintiffs seek injunctive and declaratory relief in which they pray that the court declare the Louisiana Medical Assistance Plan, the state Medical Assistance Plan, the state Medical Assistance Program Manual, and the practices and usages thereunder unlawful under federal constitutional and statutory law and state law, and in which they seek to have the Plan and Program Manual and the practices and procedures thereunder reformed to comply with federal and state law.

Plaintiffs allege that the conflict between the state medical assistance provisions and the governing federal Medicaid statutes and regulations constitutes a violation of the Supremacy Clause of the federal Constitution, and that the substantive provisions of the state Plan and Program Manual, and the practices and usages and procedures thereunder, violate the Privileges and Immunities, Due Process, and Equal Protection Clauses. Additionally, plaintiffs argue that the state substantive provisions in dispute violate state statutory law.

Specifically, plaintiffs maintain that the defendants have unreasonably, arbitrarily, and illegally discriminated against them in the operation of the State Medicaid Plan relating to certain eye care insofar as the State Plan does *not* provide for reimbursement to optometrist-vendors for eye examination services which they are allegedly legally qualified and authorized to perform under Louisiana law, and for which provision for reimbursement to ophthalmologist-vendors *is* made.[1] Plaintiffs further allege

---

1. Louisiana Medical Assistance Program Title XIX State Plan provides, in part, as follows:
   Attachment 3.1–A, Item 5A(1): "*Physician Services.* Payment is made to duly licensed Doctors of Medicine or an Osteopath who is licensed by the State Board of Medical Examiners as a physician and further licensed by the State Board of Osteopathy for the following services:
   (1) up to 12 out-patient physician visits per calendar year with provision for extension IF Medically approved...."
   Attachment 3.1–A, Item 6.b: "*Optometrists' Services.* Payment is made to optometrists for cataract glasses or contact lenses following cataract surgery."
   The evidence establishes that under these regulations, as applied by defendants, a phy-

sician-vendor is reimbursed for an eye examination so long as the physician can definitely rule out possible suspected pathology (other than refractive error). See Tr. at 16–10, testimony of Mr. J. L. Canova:
   "Court: ... If ... the physician performs a complete [eye] examination upon the patient and comes to a diagnosis that there is nothing wrong except a refraction problem, you will pay the physician for having performed that examination....?
   Witness: Yes, ... and what the physician does is he [sic] actually ends up ruling out other possible pathologies."
   On the other hand the evidence establishes that an optometrist-vendor is not reimbursed for an eye examination even in cases where a medical pathology, or disease, is diagnosed,

that the Louisiana provisions are in conflict with 42 U.S.C. § 1396d(e) [2] and additionally maintain that the defendants' actions are in violation of L.S.A. R.S. 37:1066 [3] in that such actions directly and indirectly limit or restrict the freedom of categorically and medically needy persons to choose the services of optometrists, thereby depriving plaintiffs of employment and income to which they are allegedly entitled.

Assuming, arguendo, that the authorized scope of optometric practice in Louisiana is defined as broadly as plaintiffs allege, defendants deny that they are in violation of any federal constitutional or statutory provision or of any Louisiana law, and defendants particularly deny the right of plaintiffs to have the practices and usages under the Louisiana Medical Assistance Plan and Program Manual declared unlawful insofar as they relate to eye care. Alternatively, defendants assert that the services for which the plaintiff-optometrists are seeking reimbursement are not specifically included in the defined services which optometrists are legally qualified to provide under Louisiana law defining the authorized practice of optometry in the State of Louisiana. L.S.A. R.S. 37:1041(3).[4]

STANDING:

■ Plaintiff-optometrists have standing to raise the issues which require adjudication in the instant case. In light of the allegations that the challenged State regulations have caused or will cause economic and professional injury to them, the court concludes that plaintiffs have a significant personal stake in the outcome of the controversy, sufficient to assure that the dispute sought to be adjudicated will be presented in an adversary context. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Roe v. Casey,* 464 F.Supp. 487 (E.D.Penn.1978 and cases cited therein) (physicians have standing to bring class action suit and suit on their own behalf to contest state Medicaid regulations which prohibit abortions); *Alabama Nursing Home Ass'n v. Califano,* 433 F.Supp. 1325 (D.C.Ala.1977) (nursing homes had

---

irrespective of refractory error. See Tr. at 16–11:

"Court: ... if ... [a] patient reported to an optometrist and the optometrist performed an [eye] examination and determined that there was something abnormal with the person's eye, and recommended that the person consult a medical doctor, you would not pay for the optometrist's examination?

\* \* \* \* \* \*

Witness: No, we would not .... so the answer is no, we would not pay for it. It is not covered under our program...."

The policy reasons behind the differential treatment of optometrists and ophthalmologists is explained by the testimony of Mrs. Bonnie Smith, Tr. at 16–168:

"Court: Yes, but if the patient has a red eye, or pain in the eye and that is why the patient wants to get his eye looked at, the Department, as I take it, from what I have heard here today, feels that he might as well go to the medical doctor who can not only look at it and diagnose it, determine what the problem is, but treat the problem rather than going to the optometrist who can't treat him except for putting eyeglasses.

Witness: That is the basis, rational basis for allocating the funds in that way."

**2.** 42 U.S.C. § 1396d(e) provides; in part:
"Definitions-Medical Assistance
For purposes of this subchapter—

Physicians' Services

(e) In the case of any State the State plan of which (as approved under this title...—

(1) does not provide for the payment of services ... provided by an optometrist; but

(2) at a prior period did provide for the payment of services referred to in paragraph (1);

the term 'physicians' services' ... shall include services of the type which an optometrist is legally authorized to perform where the State plan specifically provides that the term 'physicians' services', as employed in such plan, includes services of the type which an optometrist is legally authorized to perform, and shall be reimbursed whether furnished by a physician or an optometrist."

**3.** L.S.A. R.S. 37:1066 provides:
"Every person shall have complete freedom of choice to use the services of optometrists licensed under this Chapter where such services are permitted by law, and no state, parish or municipal board or agency, or any officer or employee thereof, shall either directly *or indirectly* limit or restrict the freedom of any person to choose the services of either an optometrist, a physician or a surgeon." (Emphasis added.)

**4.** See text of L.S.A. R.S. 37:1041(3), infra.

standing to assert their right to receive Medicaid payments calculated on a cost-related basis).

JURISDICTION:

As to all issues of law except those arising under state law, subject matter jurisdiction is sought to be grounded herein either upon 28 U.S.C. § 1331, federal question jurisdiction, or, alternatively, upon 28 U.S.C. § 1343, insofar as the cause of action arises under a civil rights statute, 42 U.S.C. § 1983. All issues which are not independently supported by a statutory grant of jurisdiction are argued to be cognizable under pendent jurisdiction theories. *Hagans v. Levine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

■ Jurisdiction is statutorily conferred over at least one aspect of the dispute by 28 U.S.C. § 1331, since the complaint alleges a violation of the Supremacy Clause that certain provisions of the state Plan and Program Manual are alleged to be inconsistent and incompatible with governing provisions of the Social Security Act, in particular 42 U.S.C. § 1396d(e), supra, and plaintiffs allege that the amount in controversy exceeds $10,000.00.

■ Shortly before trial defendants moved to dismiss but did not dispute the jurisdictional amount allegation in the complaint, choosing to rely instead on the ground of alleged "insubstantiality" of the constitutional claims raised by plaintiffs. A presumption of correctness attaches to jurisdictional amount allegations in the complaint, and the plaintiffs are not required to support these allegations in the absence of a factual attack. *KVOS, Inc. & Associated Press,* 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936) (formal jurisdictional allegation that amount in controversy is satisfied is sufficient to confer jurisdiction, unless other allegations in pleadings or particularized objections in motion to dismiss demonstrate that suit should be dismissed. Only when jurisdictional allegations are challenged in an appropriate manner must plaintiff support his conclusory jurisdictional allegations with proof).

Absent the attachment of federal question jurisdiction under 28 U.S.C. § 1331 to determine the merits of the alleged conflict between the state Medical Assistance provisions and the governing federal Medicaid statutes and regulations, with concomitant pendent jurisdiction to support the other related issues herein, the court maintains grave reservations regarding the presence of any other independent statutory basis for subject matter jurisdiction. Jurisdiction is doubtful under 28 U.S.C. § 1343 because that section, in pertinent part, confers jurisdiction only over actions in which substantial claims are made based upon alleged deprivations of constitutional or civil rights. It is settled that 28 U.S.C. § 1343 does not confer jurisdiction over disputes arising under the Social Security Act, for that Act is not classified as legislation which provides for "equal rights of citizens" or for "the protection of civil rights" as those terms are used in Section 1983. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

Consequently, it is only if the plaintiffs' constitutional claims under the due process, equal protection, or privileges and immunities clauses are not insubstantial that jurisdiction can be found pursuant to 28 U.S.C. § 1343. Although the prescribed test to determine the substantiality of constitutional claims is a rather strict one, i.e., whether "prior decisions inescapably render the claims frivolous," *Hagans v. Levine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), quoting *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 858–59, 35 L.Ed.2d 36 (1973); *Curtis v. Taylor,* 625 F.2d 645 (5th Cir. 1980), the court notes that there is cogent jurisprudential authority adverse to the plaintiffs which directly or analogously appears to conclusively foreclose argument on the constitutional issues raised under the due process, equal protection, and privileges and immunities clauses. This result would render these constitutional issues "insubstantial" and therefore insufficient to support jurisdiction under 28 U.S.C. § 1343. For example, with respect to the alleged violation of the Privileges and Immunities

clauses of Article 4, Section 2, Clause 1, and the Fourteenth Amendment, Section 1, of the federal Constitution, the jurisprudence is clear that it is only discrimination by a State against citizens *of another state* in favor of its *own* citizens that is prohibited by the Privileges and Immunities clauses. *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460, reh. denied, 335 U.S. 837, 69 S.Ct. 12, 93 L.Ed. 389 (1947).

Similarly, with respect to the equal protection and due process constitutional claims asserted by plaintiffs, these, too, appear to be rendered "insubstantial" by analogous Supreme Court decisions which hold that a rational basis exists for legislative distinctions between opticians and optometrists or ophthalmologists, thereby precluding assertions of constitutional claims on that basis. *Roschen v. Ward,* 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722 (1929) (upholding as constitutional, without reference to any specific constitutional clause, a New York statute making it unlawful for opticians to sell eyeglasses at retail in any store, unless a duly licensed optometrist or physician was in charge and personally in attendance); *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (upholding as non-violative of either the due process or the equal protection clauses an Oklahoma statute making it unlawful for opticians to sell or fit eyeglasses, frames or lenses without a written prescription from a licensed optometrist or physician). See also *Pushkin v. Califano,* 600 F.2d 486 (5th Cir. 1979), which upheld as non-violative of the equal protection clause a Medicare regulation which limited provision for reimbursement to optometrists for services which they were qualified to render under State law while providing for reimbursement to ophthalmologists for similar services. These cases appear to foreclose any argument that legislative distinction made between different types of health-care providers on the basis of differences in training and education are irrational or violative of the due process or equal clauses; conse-

quently these claims, too, might be considered, for jurisdictional purposes, "insubstantial."

The court notes that, assuming that the due process, equal protection, and privileges and immunities claims asserted by plaintiffs are "insubstantial" and therefore insufficient to confer jurisdiction under 28 U.S.C. § 1343, these same claims would likewise be "insubstantial" and therefore insufficient by themselves to confer jurisdiction under 28 U.S.C. § 1331. However, in light of our conclusion that jurisdiction has attached under 28 U.S.C. § 1331, at least insofar as the federal statutory and Supremacy Clause claims of the plaintiffs are concerned, no definitive determination of the "substantiality" of the plaintiffs' due process, equal protection and, privileges and immunities claims need be made for jurisdictional purposes.

Based upon the conclusion that federal question jurisdiction exists under 28 U.S.C. § 1331, at least as to the claims asserted by plaintiffs which arise under federal statutory and regulatory law and the Supremacy Clause, the court accepts jurisdiction of the merits of the state law issues as well as the merits of the federal due process, equal protection and, privileges and immunities constitutional claims, under the theory of pendent jurisdiction. *Hagans v. Levine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

THE MERITS:

The dispositive state law and federal statutory issues involved in the instant case will be addressed first, because it is possible that the disposition of these issues will render unnecessary an adjudication of the federal constitutional issues, *Siler v. Louisville & Nashville R. R. Co.,* 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909): *Hagans v. Levine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

THE STATE LAW CLAIMS:

The State Plan for the Louisiana Medical Assistance Program under Title XIX of the Social Security Act, at Attachment 3.1–A, Item 6.b., provides as follows:

*"Optometrists' Services*

Payment is made to optometrists for cataract or contact lenses following cataract surgery."

The Louisiana Public Assistance Manual Regulations, Part XIV, Eye Care, Section 14–490–92, provide as follows:

19–490 *VENDOR PAYMENT FOR EYE CARE*

 * * * * * *

B. *What Eye Care Can Be Paid*

Vendor payment shall be made for services rendered by an ophthalmologist or physician specializing in EENT (eye, ear, nose and throat). Vendor payment to an optometrist, except for those individuals eligible through the EPSDT program, shall be made only for refraction following cataract surgery.

19–491 *EYEGLASSES*

There is no provision for regular eyeglasses other than those provided through the EPSDT program.

19–492 *PURCHASE OF CATARACT GLASSES OR CONTACT LENSES FOLLOWING CATARACT SURGERY*

A. *Who is Eligible?*

For individuals enumerated in Part I, Section 19–105, vendor payment shall be made for the one pair of permanent cataract glasses or contact lenses following cataract surgery only.

Plaintiffs contend that these state Program provisions and Manual regulations violate L.S.A. R.S. 37:1066, which provides:

*"Freedom of Choice*

Every person shall have complete freedom of choice to use the services of optometrists licensed under this Chapter where such services are permitted by law, and no state, parish or municipal board or agency, or any officer or employee thereof, shall either directly or indirectly limit or restrict the freedom of any person to choose the services of either an optometrist, a physician or a surgeon."

The basis for this contention is that the state Medical Assistance Program, as currently administered, makes reimbursements for certain health care services when these are provided by ophthalmologists, but refuses to make reimbursements for identical services when these are provided by optometrists. Plaintiffs argue that the effect of this differential treatment is to cause many Medicaid eligible individuals seeking such services to obtain them from ophthalmologists rather than optometrists.[5]

Without deciding the merits of the question whether Section 1066 could provide a remedy for a *passive* indirect limitation on the practice of optometry, as opposed to the imposition of any *affirmative* sanction,[6] this court holds that L.S.A. R.S. 37:1066 has not been violated. This conclusion is based upon a finding that there has been no differential or discriminatory treatment of optometrists, because under State law optometrists are not authorized or qualified to administer the specific services for which they claim reimbursement.

---

**5.** See testimony of Michael Stephen Haddad, Assistant Secretary of the Department of Health & Human Resources, at Tr. 16–25:

"I would agree that if I was a Medicaid recipient and was interested in free care, and that care, the particular type of care I was interested in was only available from an ophthalmologist, and was not available from an optometrist, that I would attempt to seek it from an ophthalmologist if I was interested in obtaining free care and could not obtain it from an optometrist."

See also the testimony of Willard Earl Marrionneaux, Jr., O.D., at Tr. 16–46:

"Q: What effect does [the fact that complete eye examinations for the purposes of ruling out possible eye pathology are not reimbursable to optometrists under the state

Medicaid plan] have on your practice or on you professionally?

A: Well, I think it has a serious monetary effect in the fact that these patients seek visual care somewhere else."

**6.** The court notes that, even if optometrists *were* qualified under Louisiana law to make definitive diagnoses of eye pathology or disease, it is doubtful whether the fact that the Louisiana Medical Assistance Plan does not cover the cost of optometric eye examinations other than under the EPSDT and post-cataract surgery provisions would constitute a "limit[ation] or restrict[ion] [of] the freedom of any person to choose the services of . . . an optometrist" under Section 1066.

In an attempt to establish that Section 1066 is intended to prevent unequal welfare benefits with respect to the services of optometrists as opposed to services of ophthalmologists, under the rationale that such differing treatment constitutes an indirect discouragement of welfare patients from utilizing the services of optometrist-vendors, plaintiffs draw an analogy to L.S.A. R.S. 22:664. That statute prevents *private* insurers from refusing reimbursements in connection with optometric services in situations where the insurance contract provides for reimbursement of visual services performed by ophthalmologists which are also within the lawful scope of practice of a duly licensed optometrist as defined in L.S.A. R.S. 37:1041.

The court does not read Section 1066 so broadly, despite the attempted analogy made between that statute and L.S.A. R.S. 22:664. In the first place, Section 1066 of Title 37 limits its prohibition to government boards or board representatives, whereas Section 664 of the Insurance Code is a specialized statute dealing with insurance regulation. In the second place, although there is as yet very little jurisprudence interpreting the relatively new Section 1066, it should probably be interpreted as being limited to the prohibition of affirmative sanctions imposed upon patients who choose optometric care. In the instant case, no affirmative sanctions are imposed upon optometric patients, the only 'restriction' being the passive factor of lack of welfare reimbursement. Therefore, the Louisiana Medical Assistance program and program manual regulations, having no affirmative restrictions or limitations on the freedom of choice of the public to procure optometric care as opposed to ophthalmologic care, probably does not violate Section 1066, even assuming, arguendo, that duly licensed optometrists are qualified under Louisiana law to perform the identical services of definitive diagnosis for which ophthalmologists are reimbursed.

The specific service for which ophthalmologists are reimbursed under the Louisiana Medical Assistance program, and for which plaintiffs claim a right to like reimbursement, consists of performed eye examinations in cases involving suspected eye pathology for the purposes of making a definitive diagnosis of either the presence or absence of ocular disease. See footnote (1), supra.

The only alleged differential treatment between optometrists and ophthalmologists is that ophthalmologists are reimbursed for the service of making eye examinations which include a *definitive* diagnosis of the existence or non-existence of eye pathology or disease, while optometrists are not reimbursed for making eye examinations, except for examinations to determine refractory error under the Early Prevention Screening Diagnosis and Treatment program [7] and for cataract surgery patients. Thus, the scope of optometric practice becomes the focal issue because, unless optometrists are qualified under Louisiana law to perform eye examinations which include a *definitive* diagnosis of the existence or non-existence of eye pathology or disease, there can be no wrongful discrimination or illegality in the state's refusal to reimburse optometrists for services for which they are unqualified to perform.

This court finds, upon an evaluation of all the evidence, that optometrists are not authorized by Louisiana law to make *definitive* diagnoses of eye pathology or disease, and for that reason there is no substance to the allegation that the freedom of choice of any person to choose the services of an optometrist has been limited or restricted in any way.

The authorized scope of the practice of optometry in Louisiana, as defined by L.S.A. R.S. 37:1041(3), is as follows:

"As used in this Chapter, the following terms have the meaning ascribed to them in this Section, unless the context clearly indicates otherwise:

\*  \*  \*  \*  \*  \*

is not here involved.

7. A program applicable only to persons under the age of twenty-one, which all parties agree

(3) "Optometry" means that practice in which a person employs or applies any means other than surgery, for the measurement of the powers and testing the range of vision of the human eye, and determines its accommodative and refractive state, general scope of function, and the adaptation of frames and lenses, including contact lenses in all their phases, to overcome errors of refraction and restore as near [sic] as possible, normal human vision. The practice of optometry does not include the use of drugs or medication, except the use of topical ocular diagnostic pharmaceutical agents and then only by a licensed optometrist and in accordance with the provisions of this Chapter. The practice of optometry does not include the use of pharmaceutical agents, in the treatment of disease.

(4) "Diagnostic pharmaceutical agent" means any chemical in solution, suspension, emulsion, or ointment base other than a narcotic which when applied topically to the eye, results in physiological changes which permit more efficient, or otherwise facilitate, examination of the external eye or its adnexa or the evaluation of vision, or which is necessary to determine normal physiological function as part of an examination regime."

The definition of "optometry" as quoted above does not provide a clear delineation of the scope of the practice of optometry insofar as the legal qualifications of optometrists to make diagnoses of the presence or absence of ocular pathology are concerned. It appears that, prior to the amendment of Section 1041(3) in 1975, the definition of optometry was limited to [1] the practice in which a person employs or applies any means other than surgery for measuring and testing the powers and range of vision of the human eye, [2] the practice in which a person determines the accommodative and refractive state of the human eye, [3] the practice in which a person determines the general scope of function of the human eye, and [4] the adaption of frames and lenses, including contact lenses in all their phases, to overcome errors of refraction and restore to the extent possible human vision. Prior to 1975, optometric practice was concerned solely with eye function, or activity, as opposed to eye health. However, at least by implication, the 1975 amendments to Section 1041 expanded the scope of optometric practice in Louisiana beyond the mere testing and measurement of vision and other related functions of the human eye, to include eye examinations, the purpose of which were to determine physiological function, or health of the eye.

Under the 1975 amendments to Section 1041, the definition of optometry was expanded to include the "use of topical ocular diagnostic pharmaceutical agents . . . in accordance with the provision of this Chapter," which provisions, by the same amendment, specifically prohibited the use of pharmaceutical agents in the treatment of disease.

Subparagraph (4) of Section 1041, also added by amendment in 1975, defined "diagnostic pharmaceutical agent" as one whose function is related either to (1) the examination of the external eye or its adnexa or (2) the evaluation of vision, or (3) the determination of normal physiological function.

Despite the literal language referring to diagnostic use contained in the 1975 amendments to Section 1041, the revised definition of the practice of optometry, without more, does not qualify optometrists to make *definitive* diagnosis of eye pathology or disease, as opposed to making *preliminary* diagnosis, or evaluations of normal versus abnormal physiologic eye functions. The problem is one involving more than mere semantics, since a definitive or ultimate diagnosis is one upon which a medical treatment program is based, whereas a preliminary diagnosis is one used merely to refer a patient to a physician for medical treatment. Optometrists are prohibited from rendering medical treatment. Thus, an optometrist who preliminarily diagnoses an "abnormal eye" cannot treat it, he can only refer the patient to a physician who will perform his own eye examination, making a definitive diagnosis, and prescribe a course of medical treatment.

This court holds that, under the statute, optometrists are authorized to make *preliminary* diagnoses of eye pathology or disease, but they are not authorized to make *definitive* diagnoses. See deposition of Henry B. Peters, O.D., in which Dr. Peters testified that "clearly [optometrists] ... have the responsibility of detecting and making *preliminary* diagnoses of ocular diseases and ocular manifestations of systemic disease." The deposition testimony of Delmar R. Caldwell, M.D., generally supports the view that only ophthalmologists make final diagnoses, although optometrists do perform certain screening tests to expose abnormalities in the function of the eye in connection with eye examinations performed by them. Peter Kastl, M.D., testified that the conclusive establishment of the presence or absence of ocular disease or ocular manifestations of systemic disease is not a proper ultimate objective of an optometric examination. Dr. Kastl testified that the scope of an optometric examination, while perhaps preliminarily helpful to the attainment of the objective, is insufficient to accomplish the objective of definitive or final establishment or diagnosis of eye pathology or disease. See Tr. at 15–20, 21–24, 34–42, and 44–45 (in part explaining superficially inconsistent statements made by Kastl in his deposition at pp. 18–23). Dr. Kastl's expert testimony is corroborated by the testimony of Dr. Peters to the effect that it is the establishment of *preliminary* diagnoses, and not *definitive* diagnoses, which is contemplated by the objectives set forth in the "Minimum Standards for Optometric Examinations", promulgated by the Louisiana State Board of Optometric Examiners, which was introduced in evidence.

Dr. Kastl testified that optometrists are qualified to make preliminary diagnoses, defined as a determination, after examination and testing of the eye, of whether an abnormal condition exists in the eye which would be *indicative* of eye disease or eye pathology. Tr. at 15–26; 15–39.[8]

8. "Q: So ... you would agree that the only purpose for the external examination [of the eyelids, lens, cornea, sclera, etc.] ... is for the optometrist to determine pathology, preliminarily, correct?

In similar fashion, W. E. Marrionneaux, Jr., O.D., described, in his testimony, the various elements and procedures involved in an optometric examination, after which Marrionneaux was asked:

"Q: ... a number of elements of this [optometric] examination are designed to screen for or make preliminary diagnosis of possible eye pathology, is that correct?

A: Yes, sir.

\* \* \* \* \* \*

A: In looking in the eye, if I saw an inflamatory process of the eye, I would refer that to an ophthalmologist for further evaluation." Tr. at 16–36–37.

When asked about the purpose of using diagnostic pharmaceutical agents in connection with eye examinations, Dr. Marrionneaux stated that the purpose of using such agents is "to evaluate those structures [parts of the human eye] for any abnormalities." Tr. at 16–43.

Dr. Marrionneaux continued, in his testimony, to describe the services normally provided by optometrists as part of a general eye-health evaluation:

"Q: Would you please tell us what goes into making an eye-health evaluation?

A: Primarily doing a series of tests as part of my [eye] examination to determine if there is an abnormality, or evidence of ocular disease, or ocular manifestations of systemic disease; and, if so found, to refer that patient for follow-up or *definitive* diagnosis and treatment of those conditions." Tr. at 16–51–52 (Emphasis added).

Further in his testimony, Dr. Marrionneaux made this additional distinction between preliminary and definitive diagnoses:

"Q: ... And after you perform those [various eye examination] procedures, Doctor, do you interpret the results that you get from them?

A: To tell if the eye of [sic] not normal, yes." Tr. at 15–43.

A: I interpret them in the sense that I would preliminarily determine what I think the abnormality is, so when I refer the patient to the appropriate health care practitioner that I would be able to tell him what I would think that condition is and ask for his definitive follow-up evaluation [sic] treatment of that condition."

\* \* \* \* \* \*

Q: Dr. Marrionneaux, is it your position that you are qualified to diagnose ocular pathology?

A: Not necessarily definitive diagnoses, but to make a preliminary evaluation of whether the pathology is present or not present, and if so determine that it is present to refer it for definitive diagnosis and treatment." Tr. at 16–53; 16–55.

Although the precise terminology of preliminary and definitive diagnoses was not used in the following exchange, the transcript of the testimony provided by William R. Williamson, M.D., provides further insight into the contemplated diagnostic role to be played by optometrists.

"A: Basically, my opinion is that optometrists . . . can indeed tell the differences between a healthy eye and a sick eye. . . . I don't really expect them to diagnose.

\* \* \* \* \* \*

Q: Dr. Williamson, in conjunction with your last statement there, would it be fair to say that . . . your opinion is that optometrists can tell . . . whether the eye is normal?

A: That's correct." Tr. at 16–176–177.

Finally, although the court notes that a study of the scope of optometric practice conducted by the Health Resources Administration of the United States Department of Health, Education & Welfare did not rely upon or review Louisiana law in drawing its conclusions, it is of interest that this study concluded that ". . . optometrists, in general, are qualified to provide services for the detection and *preliminary* diagnosis of ocular disease and ocular manifestations of systemic disease. Referral, where indicated, is made to ophthalmologists and other health care practitioners for *definitive* diagnosis

and medical or surgical treatment." (Emphasis added) Report to Congress: Reimbursement Under Part B of Medicare for Certain Services Provided by Optometrists, Required by Title I, Section 109, of P.L. 94–182, p. iv: Attachment to Plaintiff's Exhibit P–3.

The legal authorities cited by plaintiffs in support of their proposed finding that optometrists are authorized under Louisiana law to make definitive diagnoses are not precisely on point. Plaintiffs cite the case of *Evers v. Buxbaum,* 253 F.2d 356 (D.C.Cir. 1958). That case simply held that summary judgment was not appropriate in favor of an optometrist who discovered a pathological condition in plaintiff's eye but failed to inform him of the condition or to suggest that he consult a physician. The opinion makes no attempt to define the permitted range of optometry in the District of Columbia; it only holds that an optometrist who acquires knowledge that a patient has pathology of the eye and that he ought to be seen by a physician is negligent if he fails to impart that information to the patient. *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), also cited by plaintiffs, does not deal with the issue at all. It holds that even though a state law regulating eye examinations and the sale of eyeglasses "may exact a needless, wasteful requirement," it is nevertheless "for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement." *Williamson v. Lee Optical, supra,* 75 S.Ct. at 464.

THE FEDERAL ISSUES:

Finding no violation of state law, the court will now address the issue of whether the Louisiana Medical Assistance Plan and program manual regulations are in conflict with the provisions of any federal statute or regulation.

The following federal statute and companion regulation, 42 U.S.C. § 1396d(e) and 42 C.F.R. § 441.30, respectively, are pertinent to the issues:

. . . 42 U.S.C.A. 1396d(e) provides:

**428**

"In the case of any State the State plan of which (as approved under this title . . .)—

    (1) does not provide for the payment of services . . . provided by an optometrist; but

    (2) at a prior period did provide for the payment of services referred to in paragraph (1);

the term (physicians' services) . . . shall include services of the type which an optometrist is legally authorized to perform where the State plan specifically provides that the term (physicians' services), as employed in such plan, includes services of the type which an optometrist is legally authorized to perform, and shall be reimbursed whether furnished by a physician or an optometrist."

The pertinent federal regulation which derives from 42 U.S.C. § 1396d(e), is 42 C.F.R. § 441.30:

§ 441.30 Optometric services.

"The plan must provide for payment of optometric services as physicians' services, whether furnished by an optometrist or a physician, if—

    (a) The plan does not provide for payment for services provided by an optometrist, except for eligibility determinations under §§ 435.531 and 436.-531 of this subchapter, but did provide for those services at an earlier period; and

    (b) The plan specifically provides that physicians' services include services an optometrist is legally authorized to perform.

Plaintiffs argue that the above quoted provisions mandate the state to provide for payment for those services which an optometrist is authorized to perform, if payment is made for those services when performed by a physician.

▪ The court having found that, under Louisiana law, optometrists are not authorized to perform eye examinations for the purpose of making definitive diagnoses of the presence or absence of ocular diseases, there can be no issue raised under 42 U.S.C.

1396d(e) or 42 C.F.R. § 441.30. Assuming that plaintiffs here correctly interpreted the statute and regulation, those provisions expressly relate only to services which an optometrist is authorized by state law to perform. Physicians are paid for performing definitive diagnosis of eye pathology; optometrists are not authorized to perform those services.

▪ Similarly, the constitutional arguments asserted by plaintiffs herein, which are grounded upon the alleged wrongful discrimination or differential treatment accorded to optometrists as opposed to ophthalmologists, must fail on the merits since the two groups are not similarly situated. Optometrists are not authorized to render the specific services for which they seek reimbursement and for which ophthalmologists are reimbursed and are authorized to render. Since plaintiffs have no authorization to perform the services for which reimbursement is sought, they have no legal right to the remedy which they seek. As noted earlier, the testimony of Mrs. Smith indicated that the State's policy encourages people who have eye difficulties to consult physicians who can make definitive diagnoses of pathology and prescribe a course of treatment, rather than optometrists who cannot make definitive diagnoses nor prescribe treatment. Plaintiffs argue that the policy is wasteful and imprudent because only eyeglasses, not medical treatment, are required in ninety percent of all visual problems. That may be. Their appeal, however, should be addressed to the legislature, not the courts. *Williamson v. Lee Optical Co. of Oklahoma, Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

There will be judgment in favor of defendants dismissing this action.